SWANN KEYS CIVIC ASSOCIATION,
Plaintiff Below, Appellant,

v.

Barbara B. SHAMP, John E. Humphreys and Judith A. Humphreys,
Defendant Below, Appellees.

No. 544, 2008.

Supreme Court of Delaware.

Submitted: March 11, 2009.
Decided: March 25, 2009.
Corrected: March 26, 2009.
Reargument Denied May 1, 2009.

Max B. Walton (argued) and Meredith L. Gaudio, Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware; Mary Schrider–Fox, Steen, Waehler & Schrider–Fox, LLC, Bethany Beach, Delaware, for appellant.

Dean A. Campbell (argued) and Mark H. Hudson, Law Office of Dean A. Campbell, LLC., Georgetown, Delaware, for appellees.

Before STEELE, Chief Justice, BERGER, Justice and CARPENTER[*], Judge.

STEELE, Chief Justice.

In this appeal from the Court of Chancery, the Swann Keys Civic Association asks this Court to reverse the Vice Chancellor's refusal to enforce a restrictive covenant limiting the height of homes in Swann Keys to sixteen feet, six inches. On cross-appeal, Barbara B. Shamp and John E. and Judith A. Humphreys (collectively "Shamp") assert that the Vice Chancellor erred by limiting their recoverable attorney fees to two-thirds of their actual expenses. We conclude that the Vice Chancellor correctly refused to enforce the home height limitation and that he acted within his discretion by shifting only two-thirds of Shamp's attorneys' fees. Accordingly, we affirm.

## FACT AND PROCEDURAL BACKGROUND

Swann Keys is a waterfront mobile home park in Sussex County. Three successive developers managed Swann Keys: first James and Gladys Swann, then Exten Associates, and finally B.E.T., Inc. Although a majority of the deeds that the Swanns conveyed included a Restriction 12 as part of a list of "Restrictions running with the land[,]" Exten and BET did not consistently include Restriction 12. That restriction provided in pertinent part: "Each property owner agrees to pay his *pro rata* share upon assessment by a non-profit corporation or other association of lot owners which shall operate the utilities and maintain the streets and pool, park, and common areas of the development."

In 1980, BET's failure to maintain the common areas and amenities prompted several homeowners to file a complaint in the Court of Chancery. Those homeowners requested that the court "determine the rights of the parties, particularly with respect to whether [BET] is required to form a non-profit corporation pursuant to Restriction No. 12" or, in the alternative, "issue an injunction requiring [BET] to form a non-profit corporation pursuant to Restriction No. 12 to operate utilities and maintain the streets, pool, park, and common areas of the development."

Then Vice Chancellor Hartnett (now-retired Justice Hartnett) concluded that "no decree could be entered which would be binding on the owners of all the lots in the subdivision" unless all the lot owners were made parties through joinder or certification of a class action. The plaintiffs then sent a Class Action Notice of Hearing ("the Notice") to all Swann Keys homeowners and published it for three consecutive weeks in a generally circulated Sussex County newspaper. The Notice advised: "If the plaintiffs obtain the relief they seek under the Complaint, it could result in a nonprofit corporation being formed to operate the utilities and maintain the streets, pool, park, and common areas." The Notice also informed the lot owners that they could opt out of the class.

---

[*] Sitting by designation pursuant to Del. Const. Art. IV § 12.

On April 20, 1983, Vice Chancellor Hartnett certified a class, which included the owners of 602 of the 603 Swann Keys lots.[1] On December 4, 1984, Vice Chancellor Hartnett granted, in part, the plaintiff class's motion for summary judgment.[2] He found no genuine issues of material fact in dispute over whether Restriction 12 applied to every Swann Keys lot except for the first seven lots sold by the Swanns.[3] Vice Chancellor Hartnett ordered BET to transfer title of the common areas to a nonprofit corporation, but left it to the parties to determine "how the nonprofit corporation is to obtain title to the common facilities and the amount of any sum to be paid to defendants as reimbursement for some or all of the costs of the common facilities."[4]

The class action parties entered into a Compromise and Settlement Agreement ("the Settlement"), on September 10, 1985. Among other obligations, BET agreed to covey all of the Swann Keys common areas and amenities to the Association in exchange for $300,000. The Settlement included several conditions, "the failure of any one of which may result in the termination of this [Settlement] at the sole option of [the Association]." Paragraph 1A provided in relevant part:

This [Settlement] is contingent upon and is subject to the Court of Chancery approval of this settlement, and, following the class action settlement hearing, the execution and entry of a court judgment incorporating this [Settlement] in the decree and further binding all the property owners to a set of restrictions subject to the approval of the Court. The Plaintiffs' attorney will submit a set of restrictions within twenty-one (21) days from execution of the agreement. Without limitations on the scope of the restrictions, [the Association] will be designated as the nonprofit corporation comprised of all lot owners of Swan [K]eys to operate the common areas and amenities and will have the power to assess all the Swan Keys lot owners for the operation and maintenance of the common areas who will be members of the Association. The restrictions will provide for a specific assessment or assessments to raise money for repayment of the loan used for the funding of this purchase....[5]

Rather than enter The Compromise and Settlement Agreement as the final Order, Vice Chancellor Hartnett elected to draft his own Order ("the 1985 Order"). He ordered that every Swann Keys lot owner be a member of the Association. Those lot owners received the right to elect members to the Board of the Association and were to be assessed for past due fees, necessary special fees arising from the conveyance of the common areas, and maintenance fees in the future.

The 1985 Order also provided that:

The Board of Directors may recommend reasonable rules and regulations *for the*

---

1. Janet and John Rosensweig opted out of the class, choosing to pursue an already pending action.

2. *See Atkinson v. B.E.T., Inc.,* 1984 WL 159375, at *1 (Del.Ch.).

3. Vice Chancellor Hartnett found "no evidence in the present record, however, that Restriction No. 12 was ever imposed on the first seven lots sold or that there was any common development plan when these lots were sold and conveyed." *Id.* at *4. He continued: "There remains a question of fact, however, as to whether they are subject to it because of estoppel, acquiescence, or because a uniform development plan existed from the beginning." *Id.*

4. *Id.* at *5.

5. Emphasis added.

*operation of Swann Keys* subject to approval by a majority of the lot owners. Upon approval by the majority of the lot owners, the rules and regulations shall bind and be enforceable upon all the lot owners of Swann Keys, their heirs, executors, successors and assigns. [emphasis added]

In 1986, the Association attempted to impose "zoning regulations" on the Swann Keys lot owners. It is unclear under what authority the Association claimed to impose those "zoning regulations." The Association sought the advice of its counsel. In a letter dated August 12, 1987, counsel discussed the 1985 litigation and resultant Order:

I wanted and requested the Court to adopt and attach a particular set of restrictions covering set-backs and the like, desired by the Association to the order and final judgment. This was not opposed by BET. However, *the Court did not feel this could be done.* It did, however, give substantial relief to the Association in other parts of the order.

The restrictions subject is discussed at page 9 of the order and final judgment. It provides, in part, that:

... The Board of Directors may recommend reasonable rules and regulations for the operation of Swann Keys subject to approval by a majority of the lot owners. Upon approval by the majority of the lot owners, the rules and regulations shall bind and be enforceable upon all the lot owners of Swann Keys, their heirs, executors, successors, and assigns.

Consequently, the association should develop a set of rules and obtain majority approval.... Absent this, the County rules would apply insofar as set-backs and similar matters are concerned.

As I am sure you and the other members recall, Swann Keys was described by the Court as presenting a legal nightmare and the order and final judgment entered was the best practicable and legally obtainable result.

In 1995, the Association (with approval by a majority of lot owners) adopted several regulations addressing setbacks, building guidelines, and a 16 feet, six inch home height limitation.

John and Judith Humphreys purchased their lot in 1997, and Barbara Shamp purchased her lot in late 2006. In 2007, these lot owners attempted to convince the Association's Board of Directors that the Board's authority to adopt and enforce "restrictions" was limited to the common areas alone. The Board rejected that position and refused to hold another membership vote regarding the home height restrictive covenant. The Humphreys and Ms. Shamp, nonetheless, began to construct homes whose heights exceeded sixteen feet, six inches.

In 2007, the Association filed this suit to enforce the height limitation. The Association expressly invoked 10 *Del. C.* § 348, which "is intended to provide an expeditious forum for the resolution of disputes involving the enforcement of deed covenants and restrictions."[6] The assigned Vice Chancellor rejected the Association's request for a temporary restraining order but warned:

[H]ere's what I'm saying. Your clients can build all they want. I'm not putting in place a temporary restraining order. If they build and they have to tear it down, they'll have to tear it down. So I would urge them, if I were you, not to have them do anything foolish. I won't hesitate for a second to make them tear it down.

---

**6.** *See* 75 Del. Laws ch. 379, § 2 (2006).

Following unsuccessful mediation, the parties submitted the matter to the Vice Chancellor on a paper record without a trial. Ultimately, the Vice Chancellor agreed with Shamp that the Association could only adopt rules and regulations involving the Swann Keys common areas and amenities.

The Vice Chancellor determined that "[t]he court's power . . . to bind all the lot owners to its Final Judgment came from the fact that all the lot owners were joined in that action through a class action certification." [7] To determine the scope of the 1985 Order, the Vice Chancellor relied on the precedent Notice of Class Action. [8] Because that Notice advised the lot owners that the litigation "could result in a non-profit corporation being formed to operate the utilities and maintain the streets, pool, park, and common areas," the Vice Chancellor determined that the Notice "gave no indication that the rights of the lot owners in the free use of their individual parcels might be limited as a result of the litigation, much less that these rights could be altered at the whim of a future majority of the neighborhood's lot owners." [9] The Vice Chancellor believed it "reasonable to assume" that Vice Chancellor Hartnett's Final Judgment only addressed issues "within the scope of the controversy, and, importantly, within the scope of matters for which the class was certified." [10]

Shamp filed a motion for reconsideration, requesting the Vice Chancellor to award attorneys' fees pursuant to 10 *Del. C.* § 348(e). That section provides that

"[t]he nonprevailing party at a trial held pursuant to the provisions of this section must pay the prevailing party's attorney fees and court costs, unless the court finds that enforcing this subsection would result in an unfair, unreasonable, or harsh outcome." [11] The Vice Chancellor directed Shamp to submit an attorneys' fees affidavit to the Association but did not direct Shamp to file a copy with the court. He then issued his decision without any further hearings, briefing, or oral argument.

The Vice Chancellor awarded Shamp two-thirds of their requested attorney fees. [12] Although the Vice Chancellor stated that he believed that each side should bear its own costs, he recognized that § 348 dictated a contrary result. [13] He determined "that it would be unreasonable, unfair, and harsh to shift all of the costs incurred by the defendants" because they "deployed a seine net when a couple of fly rods would have been more than sufficient," meaning that they "raised a variety of side issues with questionable utility." [14] The Vice Chancellor concluded that "[b]y reducing the fees to be shifted in this manner, I eliminate any unfairness, but still shift fees in appropriate deference to the General Assembly's policy decision." [15]

This appeal and cross-appeal followed.

## DISCUSSION

### I. The Height Restriction is Not Enforceable.

██ The Association argues that the plain language of Vice Chancellor Hart-

---

7. *Swann Keys Civic Ass'n v. Shamp*, 2008 WL 4482705, at *5 (Del.Ch.).

8. *Id.*

9. *Id.*

10. *Id.* at *6.

11. 10 *Del. C.* § 348(e).

12. *Swann Keys Civic Ass'n v. Shamp*, 2008 WL 4698478, at *1 (Del.Ch.).

13. *Id.* at *2.

14. *Id.* at *1.

15. *Id.* at *2.

nett's 1985 Order gave its Board of Directors (with the approval of a majority of lot owners) the power to adopt "reasonable rules and regulations for the operation of Swann Keys," including the power to enforce height limitations. They assert that nothing in the plain language of the 1985 Order limited the community's ability to adopt reasonable rules and regulations to the common areas.

The Association also contends that counsel's 1987 letter supports a broad interpretation of the 1985 Order. In that letter, they contend that counsel advised them that, although Vice Chancellor Hartnett refused to include "a particular set of restrictions covering set-backs and the like," the 1985 Order gave "substantial relief to the Association in other parts of the order" by allowing the Association to adopt "restrictions" recommended by the Board of Directors and approved by a majority of the lot owners. Because that same counsel participated in the class action litigation, the Association contends this supports their broad interpretation of the 1985 Order.

Finally, the Association asserts that the Vice Chancellor erred by concluding that the Notice of Class Action sent to the lot owners "gave no indication that the rights of the lot owners in the free use of their individual parcels might be limited as a result of the litigation, much less that these rights could be altered at the whim of a future majority of the neighborhood's lot owners." The Association contends that, given the plain language of the 1985 Order, Vice Chancellor Hartnett believed the lot owners had received adequate no-

tice that the litigation could affect the use of their individual lots.

In response, Shamp maintains that the 1985 Order only gave the Association the power to regulate the common areas and that the lot owners did not receive notice that the class action litigation could affect their individual lots. Because the restrictive covenant created by the 1985 Order is ambiguous, Shamp contends it "must be construed so as to limit the effect of the restriction." [16]

Shamp argues that the Vice Chancellor correctly focused on the Notice sent to the lot owners. According to Shamp, that Notice "does not inform the owners that in the future they may lose property rights by the votes of their neighbors." Shamp asserts that, therefore, even if the 1985 Order can be interpreted as broadly as the Association asserts, due process mandates that they are not bound by that portion of the 1985 Order allegedly authorizing "zoning regulations," and, in particular, the home height limitation.

Reviewing the record *de novo*,[17] we agree with the Vice Chancellor's conclusion that the Swann Keys lot owners did not receive notice that the 1980s class action litigation could affect their right to build a home higher than sixteen feet, six inches (or, for that matter, any restrictions on private lots tantamount to zoning regulations).

Court of Chancery Rule 23(a) specifies four requisites for a representative party to maintain an action on behalf of an entire class:

> One or more members of a class may sue . . . as representative parties on be-

---

**16.** Citing *Point Farm HOA v. Evans*, 1993 WL 257404 (Del.Ch.1993).

**17.** *In re Philadelphia Stock Exchange, Inc.*, 945 A.2d 1123, 1135 (Del.2008) ("To the ex-

tent this argument raises a due process question, that is an issue of law which this Court reviews *de novo*.").

half of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) *the representative parties will fairly and adequately protect the interests of the class.*[18]

Indeed, due process requires "that the named plaintiff at all times adequately represent the interests of the absent class members."[19] Due process also entitles absent class members to "notice, an opportunity to be heard, and a right to opt out in order to be bound by a settlement."[20] "If the principles of due process are not followed, members of the class cannot be bound by a judgment or settlement."[21]

Here, Paragraph 9 of the Notice described the relief sought in the 1980s class action litigation: "If the plaintiffs obtain the relief they seek under the Complaint, it could result in a nonprofit corporation being formed to operate the utilities and maintain the streets, pool, park and common areas of the development." We agree with the Vice Chancellor that the Notice "gave no indication that the rights of the lot owners in the free use of their individual parcels might be limited as a result of the litigation, much less that these rights could be altered at the whim of a future majority of the neighborhood's lot owners."[22]

Given the limited scope of the Notice sent to the lot owners, the 1985 Order may only require Shamp to (1) be a member of the Association and (2) pay their prorata share of operating costs for the common areas. The 1985 Order does not authorize the Association to limit home heights in Swann Keys. Because this conclusion is case dispositive, we do not address the parties' contentions regarding the various alternative interpretations of the 1985 Order.

## II. *The Vice Chancellor Appropriately Reduced Shamp's Attorneys' Fees.*

■ On cross-appeal, Shamp argues that the Vice Chancellor erred by limiting their recoverable attorneys' fees to two-thirds of their actual expenses. Shamp disputes the Vice Chancellor's finding that Shamp pleaded more defenses than necessary. Shamp contends that their counsel merely acted to fulfill their ethical duty to represent Shamp zealously. Shamp argues they "should not now be punished for defending themselves from a baseless suit brought by an overly zealous homeowners association." At the very least, Shamp contends that the Vice Chancellor should have requested an attorneys' fees affidavit rather than "arbitrarily" awarding two-thirds of their actual costs.

In response, the Association argues that the Vice Chancellor acted well within his discretion by reducing the attorneys' fees.

---

18. Ct. Ch. R. 23(a) (emphasis added).

19. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). "Chancery Court Rule 23 is almost identical to Rule 23 of the Federal Rules of Civil Procedure. Accordingly, in construing Chancery Court Rule 23, we find persuasive authority in the Advisory Committee's Note on the federal rule and the interpretation of that rule by the federal courts." *Nottingham Partners v. Dana*, 564 A.2d 1089, 1094 (Del.

1989) (citing *Hoffman v. Cohen*, 538 A.2d 1096, 1097–98 (Del.1988)).

20. *MCA, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, 785 A.2d 625, 635 (Del.2001) (citing *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965).

21. *Id.* (citation omitted).

22. *Swann Keys Civic Ass'n v. Shamp*, 2008 WL 4482705, at *5 (Del.Ch.).

The Association cites the Vice Chancellor's finding that Shamp sought fees for claims and defenses of "questionable utility." The Association contends that the Rules of Professional Conduct required only that Shamp pursue meritorious claims and defenses.

 "The Court of Chancery's discretion is broad in fixing the amount of attorneys' fees to be awarded. Absent a clear abuse of discretion, we will not reverse the Court of Chancery's award."[23] After carefully reviewing the record, we conclude that the Vice Chancellor acted within his discretion by shifting only two-thirds of Shamp's attorneys' fees. Although in many cases where time spent and reasonable rates are disputed and out of pocket costs seem excessive, we believe it may be best practice to request attorneys' fees affidavits. Here, however, the Vice Chancellor's opinion demonstrates his careful attention to the pleadings, the time spent on relevant, as opposed to irrelevant, contentions and reflects a logical assessment of what efforts were valued. Under the circumstances of this case, there can be no utility to dwelling on the issue in the absence of a clear abuse of discretion.

The Vice Chancellor "observed first hand the efforts of counsel and arrived at a reimbursement amount [he] felt was reasonable under the circumstances."[24] He determined that Shamp "raised a variety of side issues with questionable utility" and that "it would be unreasonable, unfair, and harsh to shift all of the costs incurred by the defendants."[25] We will not disturb that rational determination.[26]

---

**23.** *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del.2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del.1998)).

**24.** *See Roadway Express v. Folk*, 817 A.2d 772, 776 (Del.2003).

## CONCLUSION

For the above reasons, we affirm the Court of Chancery's judgment.

**25.** *Swann Keys*, 2008 WL 4482705, at *1.

**26.** *See Folk*, 817 A.2d at 776.