# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| Quail Village Homeowners Association, Inc., | ) | C.A. No. 9131-MG |
| A corporation of the State of Delaware | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| Janice Rossell, | ) | |
| Respondent. | ) | |

# MASTER'S REPORT

Date Submitted: September 4, 2018
Draft Report: June 25, 2018
Final Report: December 10, 2018

Gary R. Dodge, CURLEY DODGE & FUNK LLC, Dover, Delaware, *Attorney for Petitioner.*

Peter K. Schaeffer, Jr., AVENUE LAW, Dover, Delaware; *Attorney for Respondent.*

GRIFFIN, Master

Pending before me is an action filed by a homeowners' association against a homeowner who erected an accessory structure on her property without first seeking approval from the community's architectural review committee ("ARC"). The association alleges that the homeowner uses the structure to house undomesticated cats.[1] It further claims the homeowner's feeding and housing of these cats violates the community's deed restrictions, and encourages the undomesticated cats to gather in the community, causing a nuisance or dangerous or offensive conditions in the neighborhood, further violating the community's deed restrictions. The homeowner claims that her activities with the cats, including engaging in trap, neuter, and release ("TNR") activities with feral cats coming onto her property, are not causing the conditions in the community involving feral cats but are helping to reduce the problems. The association seeks injunctive relief, and both parties seek attorney's fees. For the reasons set forth below, I recommend that the Court deny the association's claims that the homeowner violated the deed restrictions by keeping undomesticated cats on her property and by causing a nuisance through her cat activities, but grant its claim that the homeowner violated the deed restrictions by failing to seek ARC approval prior to building an accessory structure on her property. And I recommend that the Court grant injunctive relief related to submission of a

---

[1] References to undomesticated cats and feral cats will be used interchangeably in this report, since it appears that, for purposes of this report, both descriptions refer to cats with the same characteristics, which will be discussed later in this report.

request for ARC review of the accessory structure by the homeowner. Finally, I recommend that the Court decline to find a waiver of enforcement of deed restrictions has been proven in this case, or to shift fees for either side under 10 *Del. C.* § 348(e). This is a final report.

## I.  Background

On December 3, 2013, Plaintiff Quail Village Homeowners Association, Inc. (the "Association"), which serves as the association for the homeowners for the Village of Wild Quail Golf and Country Club ("Quail Village"), filed a Verified Complaint to Enforce Deed Restrictions under 10 *Del. C.* § 348 against Defendant Janice Rossell ("Rossell"), who has been a property owner and lived in Quail Village since 2004. Quail Village is governed by a declaration of restrictions (the "deed restrictions") which was executed on June 15, 1994 and recorded.[2]

The Association asserts that Rossell committed three violations of the deed restrictions: (1) she built an accessory structure on her property without first obtaining approval from ARC in violation of Article II, section 2 of the deed restrictions ("Section 2"), and also of Article II, section 5 of the deed restrictions ("Section 5"), since the structure is used as outside housing for cats; (2) she keeps undomesticated cats on her property in violation of Section 5; and (3) her use of her

---

[2] Docket Item ("D.I.") 1, Ex. A (Declaration of Restrictions for Quail Village).

property – feeding and housing undomesticated cats, and engaging in TNR activities[3] – has created a nuisance or is dangerous or offensive to the neighborhood in violation of Section 2. The Association seeks injunctive relief requiring the homeowner to apply for ARC's approval of the structure within 30 days, or remove the structure; requiring her to remove all outside cat food pans and cat pet doors within 30 days; and prohibiting her from ever keeping undomesticated cats on her property, or ever releasing them in the community. It also seeks attorney's fees under 10 *Del. C.* § 348(e).

Rossell denied the Association's allegations in her April 2, 2014 answer. Rossell claims that her activities do not constitute a nuisance because there is no evidence that she uses the accessory structure to house cats or that she created the feral cat problem; instead, she argues expert testimony indicated that her actions in engaging in TNR activities with feral cats on her property help to abate the problem in the community. Further, she asserts she was notified of objections to the accessory structure only after the structure was completed and those objections were only based on her failure to submit an application for approval and the alleged use of the

---

[3] Donna Cataldi-Baize, a TNR expert ("TNR expert") testifying at trial, described TNR activities as trapping feral cats living in colonies, taking them to be spayed or neutered, and then releasing them back to the colony, with the purpose of helping to control or reduce the overpopulation of cats. Trial Tr. 137: 10-14; 138: 20-22.

building to house cats, and not on the structure's size, shape, color or location, which are the factors specified for ARC consideration under the deed restrictions. Rossell also claims that she offered to submit an application after the objections were communicated to her, and her offer was refused. Finally, she asserts that the Association enforced deed restrictions as to structures on other properties in an arbitrary and capricious manner, thereby waiving or abandoning its ability to enforce the restrictions based upon equitable principles, and that the Association should pay her attorneys' fees.

Mandatory mediation under 10 *Del. C.* § 348 was unsuccessful. Additional motions were filed, and the trial was rescheduled several times. The Association filed a motion for summary judgment on March 14, 2016. Master Ayvazian recommended denying that motion in a December 15, 2016 final report, which was approved by the Court on January 5, 2017. In that report, she held there are genuine issues of material fact related to Rossell's use of the accessory structure on her property, whether the cats she houses are domesticated or feral, and whether her feeding and sheltering cats and engaging in TNR activities to address feral cat problems constitute a nuisance in violation of the deed restrictions.[4] Master Ayvazian

---

[4] *Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2016 WL 7242580, at *5 (Del. Ch. Dec. 15, 2016), *adopted*, (Del. Ch. Jan. 5, 2017).

retired and this case was assigned to me. A trial on this matter was held on February 15, 2018, with the parties submitting simultaneous written closing arguments on March 21, 2018. I issued a draft report on June 25, 2018, and the Association filed exceptions on July 5, 2018, which were briefed. In this final report, I have either modified the report to address the exceptions, or consider them adequately addressed.

## II. Analysis

The Association has the burden of proof in this matter and must show by a preponderance of the evidence that it is entitled to the relief it has requested.[5] "Proof by a preponderance of the evidence means proof that something is more likely than not ... [and] that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes [the finder of fact] believe that something is more likely true than not."[6] The three allegations of deed restrictions violations, the waiver or abandonment defense to restrictions' enforcement, and the attorney's fees claims, are addressed below.

### A. ARC approval requirements

The first issue I address pertains to the Section 2 requirement that "no buildings or structure (i.e. swimming pool, tennis court) or addition shall hereafter be

---

[5] *Cf. Walker v. Williams*, 2016 WL 3569260, at *6 (Del. Ch. June 23, 2016); *Estate of Osborn v. Kemp,* 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd,* 2010 WL 1112373 (Del. Mar. 25, 2010) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard.").

[6] *Walker*, 2016 WL 3569260, at *6 (citation omitted).

erected, altered or placed on any Lot unless the plans have been approved by the Architectural Committee."[7] That section prescribes that owners seeking to construct or alter a building or structure submit two sets of plans showing all four elevations "together with a description of the exterior materials and their color," a site plan showing the location of the building or structure on the lot, and a grading plan.[8] The accessory structure on the Rossell property is stick built, one floor and approximately eight by eleven feet.[9] There are two pet doors installed in the structure.[10]

Deed restrictions requiring approval of an association's architectural review committee before a homeowner can erect, make alterations or improvements to a building on their property, are enforceable if they articulate "a clear, precise and fixed standard that the reviewing body must apply."[11] However, such restrictions "are viewed with suspicion due to the tendency of such review to be arbitrary, capricious

---

[7] D.I. 1, Ex. A, Art. II § 2.

[8] *Id.*

[9] Trial Tr. 41: 16-22.

[10] Trial Tr. 16: 6-15.

[11] *Benner v. Council of Narrows Ass'n of Owners*, 2014 WL 7269740, at *1, *7 (Del. Ch. Dec. 22, 2014), *adopted,* (Del. Ch. Mar. 16, 2015); *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986), *aff'd,* 538 A.2d 1113 (Del. 1988) ("where the language used in the restrictive covenant empowering the committee is overly vague, imprecise, or so unclear as not to lend itself to evenhanded application, then the grant of authority is normally not enforceable").

and therefore unreasonable," and are strictly construed.[12] In reviewing requests under deed restrictions, approval by an association's architectural review committee cannot be "withheld unreasonably" and the burden falls on the architectural review committee to show its actions are reasonable.[13]

It is undisputed that Rossell failed to comply with the deed restrictions' requirement that she seek approval from ARC prior to building the accessory structure on her property.[14] I next consider the issue of what is the appropriate equitable relief for that non-compliance based on the circumstances in this case.

The Association seeks injunctive relief based upon Rossell's failure to apply for ARC's approval of the structure alone and asks that she be required to request ARC approval for the structure within 30 days or remove it. It argues that it was denied the opportunity to either approve or reject Rossell's plan to build the accessory structure, and that the integrity of the architectural review process is compromised if homeowners are allowed to ignore the application process and "ask for forgiveness" later.[15] Rossell claims that equity does not support removal of the

---

[12] *Benner*, 2014 WL 7269740, at *7; *see also Tusi v. Mruz*, 2002 WL 31499312, at *3 (Del. Ch. Oct. 31, 2002) ("because [architectural review restrictions] restrict the 'free use of property,' restrictive covenants must be strictly construed").

[13] *Dolan v. Villages of Clearwater Homeowner's Ass'n, Inc.*, 2005 WL 2810724, at *4 (Del. Ch. Oct. 21, 2005).

[14] Trial Tr. 34: 16-19.

[15] *Quail Village Homeowners Ass'n, Inc. v. Rossell*, 2016 WL 7242580, at *6 (Del. Ch. Dec. 15, 2016), *adopted*, (Del. Ch. Jan. 5, 2017).

structure when the only objection on the record is Rossell's failure to request approval.[16]   She asserts that none of the objections to the building, based upon witness testimony at trial, show any issue with the building's size, shape, color or location – the factors identified in the deed restrictions for ARC to apply in evaluating the structure.[17]

The typical remedy if a party demonstrates a violation of a right is permanent injunctive relief.[18]   To obtain that relief, the party must also show that, absent the relief, it will suffer irreparable harm and that the equities balance in its favor.[19] Equity will not reward a knowing breach of restrictions.[20]   But, if there was an innocent mistake on the part of the violator, or the violator's conduct was not willful and inexcusable, courts have balanced the extent of the harm caused by the violation in determining injunctive relief.[21]

---

[16] D.I. 77, at 8-9.

[17] *Id.*, at 8.  Further, the Association's complaint identifies only the use of the structure for outside housing for undomesticated cats as the basis of the Association's objections to the structure. D.I. 1, ¶¶ 11-15.

[18] *Thompson v. Town of Henlopen Acres*, 1996 WL 117652, at *5 (Del. Ch. Mar. 7, 1996); *Hollingsworth v. Szczesiak*, 84 A.2d 816, 822 (Del. Ch. 1951).

[19] *Plantation Park Ass'n, Inc. v. George*, 2007 WL 316391, at *3 (Del. Ch. Jan. 25, 2007); *Thompson*, 1996 WL 117652, at *5; *Pomilio v. Caserta*, 206 A.2d 850, 853 (Del. Ch. 1964), *aff'd,* 215 A.2d 924 (Del. 1965) ("[i]t is well established in Delaware that one seeking injunctive relief must do equity").

[20] *Plantation Park Ass'n, Inc.*, 2007 WL 316391, at *3.

[21] *Hollingsworth*, 84 A.2d at 822.

In this case, I recommend the Court grant injunctive relief requiring Rossell to submit a request for ARC review of the accessory structure on her property within 30 days after this report becomes final, and that ARC review it and decide whether it will approve the structure within 30 days after the request is filed.[22] In the interest of justice, this case will remain open for 90 days after this report becomes final to allow this Court to retain jurisdiction in the event that the process detailed above leads to additional disputes regarding Rossell's accessory structure. In devising this injunctive relief, I rely on Rossell's constructive notice of the approval requirement because the deed restrictions were recorded (even though she testified that she was unaware of the restriction requiring prior ARC approval), and that there was no evidence that the Association communicated its objections to Rossell prior to the structure's completion or that Rossell knowingly proceeded with construction at her

---

[22] The Association argues, in its exceptions, that the language in the draft report related to ARC's future review and approval of the structure would limit the reviewing process too narrowly. It asserts that ARC should be allowed to consider all relevant factors, including Rossell's possible future use of that structure as outside housing for cats. D.I. 82, at 5. Rossell responds that ARC review of the structure based upon future use is speculative and relies on criteria not included in the deed restrictions. D.I. 87, at 7. After consideration, I modified the draft report. However, any subsequent court review of an ARC determination regarding this structure, if needed, will be based upon legal considerations pertaining to the enforcement of deed restrictions.

own risk.[23]  Further, it is disputed whether Rossell was subsequently told to submit an application, or to remove the structure.[24]

This relief recognizes the ARC approval requirement in the deed restrictions, while allowing for further court review of this matter, if appropriate, based upon the limitations that apply regarding the enforcement of deed restrictions.  Rossell's argument – that the Association's witnesses, who serve on ARC, failed to express specific objections to the structure based upon the deed restrictions' standards – is premature, since Rossell has not yet requested ARC's review of the structure and ARC has not responded to such a request.  Further, any issues concerning the enforceability of the deed restrictions requiring ARC approval and their application by ARC, would become ripe only after that review has occurred.

The Association also claims that the accessory structure is being used to house cats and, under Section 5, such housing must to be approved by ARC.  Section 5 provides, in pertinent part, "[d]ogs, cats or other domesticated household pets may be

---

[23] *Cf. Van Amberg v. Bd. of Governors of Sea Strand Ass'n*, 1988 WL 36127, at *7 (Del. Ch. Apr. 13, 1988) ("Constructive notice is normally established by properly recording the instrument that contains the alleged restriction."); Trial Tr. 34: 3-8, 16-19; 49: 13-17.

[24] Rossell testified that John Tullis ("Tullis"), who is a Quail Village homeowner and was then an ARC member, came to her property after the structure was completed and indicated that she could not submit an application and the structure should be torn down. Trial Tr. 193: 10-19.  Tullis testified that he had not said he would refuse to take an application and Rossell could submit an application now. Trial Tr. 68: 7-10.  The Verified Complaint states that the Association's representatives have "repeatedly demanded removal of the structure." D.I. 1, ¶ 15.

kept, provided . . . any outside housing for any such animals or pets must be approved by the Architectural Committee."[25]

First, the evidence fails to show that Rossell uses the structure as outside housing for cats. Rossell testified that the pet doors in the structure are locked and there was no testimony that cats are being housed in the structure.[26] In the absence of evidence showing the structure is used as outside housing for pets, the ARC approval requirement under Section 5 is not implicated.[27]

Finally, the Association included a claim in its closing argument that Rossell's installation of pet doors in her garage and the structure violates Section 2 because she failed to obtain ARC approval for the pet doors. I discount this claim for two reasons. First, the Association initially introduced this claim at the pre-trial conference. I denied the addition of this claim, given its timing – less than a week before trial – in a case of a protracted duration where no reasons justifying the delay were offered. Further, I find the deed restrictions do not require ARC review for pet

---

[25] D.I. 1, Ex. A, Art. II § 5.

[26] Trial Tr. 194: 9-11. Rossell's testimony indicated that the pet doors on the structure, although locked now, could be unlocked. Trial Tr. 214: 10-15. The existence of pet doors on the structure potentially allows for the use of the structure as outside housing for cats. However, there was no evidence presented that she was doing so and I must make findings based upon the evidence presented.

[27] *See Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2016 WL 7242580, at *4 (Del. Ch. Dec. 15, 2016), *adopted*, (Del. Ch. Jan. 5, 2017).

11

doors. The relevant deed restriction language is "[n]o buildings or structure (i.e. swimming pool, tennis court) or addition shall hereafter be erected, altered or placed on any lot unless the plans have been approved by [ARC]."[28] The common sense reading of this language is that it captures "significant change to a lot … that is both large and permanent."[29] Pet doors are not permanent, their installation does not require plans, the cost for installation is not substantial, and they do not add to or detract from the property value in a material way. They do not reach the level of alteration that would reasonably require ARC review. And there was no evidence that ARC approval had ever been sought or required previously related to other pet doors in Quail Village.

## B. Keeping cats

It is undisputed that Rossell feeds and shelters cats on her property. Rossell testified, at the time of trial, that she was feeding 28 cats on her property – 10 living in her house and another 18 outside.[30] She had installed crates and boxes in her garage for the outside cats, which enter and leave the garage through a pet door.[31]

---

[28] D.I. 1, Ex. A, Art. II § 2.

[29] *Cf. Laumbach v. Westgate*, 2008 WL 3846419, at *5 (Del. Ch. Aug. 19, 2008), *aff'd,* 966 A.2d 349 (Del. 2009).

[30] Trial Tr. 25: 18-23; 27: 4-6. At the time of Rossell's deposition (which, based upon the record, appears to have taken place in April of 2015), she testified she was feeding 40 cats. Trial Tr. 25: 13-16. The TNR expert testified that Rossell had been losing cats in recent months as her cats are older and have lived out their lives. Trial Tr. 150: 4-9.

[31] Trial Tr. 28: 12-14; Resp.'s Tr. Ex. 4.

She places the food for the outside cats in the garage, and on the front and back porches of her house.[32] The issue is whether Rossell's activities are in violation of Section 5, which states:

> 5. <u>Animals</u>. No fowl shall be raised or kept and no kennel for the breeding or boarding of dogs shall be erected, maintained or used upon any Lot, and no horses, ponies or livestock shall be housed or maintained on any Lot. Dogs, cats or other domesticated household pets may be kept, provided (1) that they are not kept, bred or maintained for any commercial purpose, and (2) any outside housing for any such animals or pets must be approved by the Architectural Committee.[33]

Interpreting deed restrictions is a matter of contract interpretation and provisions are construed by determining original intent from the plain and ordinary meaning of the words.[34] Any ambiguities in the deed restrictions are resolved in favor of the grantee (Rossell) and against the grantor (the Association).[35] If the language is ambiguous, or "reasonably susceptible of different interpretations," the Court may consider extrinsic evidence to determine intent and "ascribes to the words their common or ordinary meaning, and interprets them as would an objectively

---

[32] Trial Tr. 29: 7-9.

[33] D.I. 1, Ex. A, Art. II § 5.

[34] *See New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 747 (Del. Ch. 2013), *aff'd*, 105 A.3d 990 (Del. 2014); *Pues v. Simpson*, 2009 WL 1451853, at *2 (Del. Ch. May 26, 2009) ("Although restrictive covenants are strictly construed because of their impact on private property rights, familiar principles of contract law govern their enforcement. In short, the chosen words are given their plain and ordinary meaning, and, if that process admits of only one reasonable understanding, the covenant is not ambiguous" (citations omitted)).

[35] *Cf. Serv. Corp. of Westover Hills v. Guzzetta*, 2009 WL 5214876, at *3 (Del. Ch. Dec. 22, 2009)

13

reasonable third-party observer."[36]  It is well-established that Delaware courts can look to dictionaries for assistance in determining the intended meaning of contract terms.[37]

Section 5 provides that "cats or other domesticated household pets may be kept."  There is no limitation on the number of cats that can be kept.  One understanding of the language in Section 5 is that any cat may be kept, with no limitation.  Under that interpretation, none of Rossell's cats (whether domesticated or not) run afoul of Section 5.   However, when considering the language as a whole, I find that there is another reasonable interpretation of what was intended by that language – that the cats which can be kept are domesticated, household pets.[38]  The

---

[36] *Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *6 (Del. Ch. Dec. 31, 2008); *see also AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008) ("[i]f there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended." (citation omitted)).

[37] *Cf. Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) (dictionaries are "the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract").

[38] *Cf. Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385-86 (Del. 2012) ("[i]t is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument").  And, in her Master's Report, Master Ayvazian identified one of the material issues in this case as whether Rossell's cats are domesticated or not. *Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2016 WL 7242580, at *5 (Del. Ch. Dec. 15, 2016), *adopted,* (Del. Ch. 2017).

14

deed restrictions do not define cats, domesticated household animals, or keeping a pet or animal. The dictionary describes "domesticated" as adapted "over time from a wild or natural state to [live] in close association with and to the benefit of humans," and "household" as "those who dwell under the same roof." [39] "Keep" can mean to "have in control," "retain in one's possession or power," or "take care of."[40]

Under Delaware law, a person is "keeping" a cat if she has possession or control of the cat and, if the animal is a stray domesticated cat, she has fed them for three or more consecutive days.[41] Looking at both the dictionary definition of "keeping" and Delaware law, Rossell would be considered as keeping the cats if she has possession and control over them, and also if the cats are stray domesticated animals that she has fed three or more days. Stray cats are defined by Delaware law

---

[39] *Domesticate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/domesticate (last visited December 5, 2018); *Household*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/household (last visited December 5, 2018).

[40] *Keep*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/keep (last visited December 5, 2018).

[41] 16 *Del. C.* §3013F(i) (for purposes of the animal population control program, a person in possession or control of a cat becomes a "keeper" of a stray domesticated animal if they feed that animal for "at least 3 consecutive days"). And, for background purposes only, the Delaware Health and Social Services ("DHSS") website describes stray cats as "pets that have been abandoned or lost. They are used to contact with people and may approach you to seek attention. Others may appear feral at first, but once you befriend them, you'll find that they enjoy human touch." *Found/Stray Cats*, DHSS/Div. of Pub. Health, http://www.dhss.delaware.gov/dhss/dph/oaw/foundstraycats.html (last visited on December 10, 2018).

as having "no known owner" or "not wanted by its owner."[42]   And, feral cats are defined as the offspring of abandoned domestic cats who revert "to a semi-wild state and [live] outside in family groups called colonies," and have temperaments of "extreme fear and resistance to contact with humans."[43]

I next consider, for purposes of Section 5, whether Rossell's cats are "domesticated," "stray domesticated," or feral cats.[44]   The TNR expert testified that a domesticated cat is one that "lives within a home" – an "indoor cat."[45]   She further

[42] 16 *Del. C.* §3013F(a).

[43] 16 *Del. C.* §3013F(g).   Also for background, the DHSS website describes feral cats as "not socialized to people and liv[ing] on their own outside.  They are usually too fearful to be handled or adopted." *Found/Stray Cats*, DHSS/Div. of Pub. Health, http://www.dhss.delaware.gov/dhss/dph/oaw/foundstraycats.html (last visited on December 10, 2018).

[44] In its exceptions, the Association asserts that the report adopts definitions regarding types of cats (domesticated, stray domesticated, and feral) without seeking argument or briefing from the parties. D.I. 82, at 8, n. 4.  The issue of discerning what type of cat that Rossell's cats are has been a focal point of this action since well before the trial.  Master Ayvazian's December 16, 2016 final report stated that a material issue in this case is distinguishing between domesticated and undomesticated cats, and her report noted a question to be addressed at the trial – if Rossell is "housing and feeding these cats, as has been alleged, are they considered 'stray domesticated' cats within the scope of Delaware's domestic animal laws?" *Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2016 WL 7242580, at \*5 (Del. Ch. Dec. 15, 2016), *adopted,* (Del. Ch. 2017).   The parties submitted post-trial closing arguments in which they were asked to review the facts and the law as related to major legal issues in the case. Trial Tr. 220: 1-4.  The parties had ample opportunity during the proceedings to provide legal arguments concerning the types of cats.  And, courts can refer to statutory and dictionary definitions, where appropriate, as I have done here, in defining terms. *Cf. Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) ("[u]nder well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined"); *Ingram v. Thorpe*, 747 A.2d 545, 548 (Del. 2000).

[45] Trial Tr. 158: 2-4.  She further stated that she doesn't "believe in outdoor cats, but people allow their domesticated cats to go in and out."

commented that strays are cats that can be domesticated and brought into a home, while feral cats are "pretty much" wild cats – ones "you cannot touch."[46] She further stated that a domesticated cat, if it has been outside and had to fend for itself, can become "very feral."[47] She referred to Rossell's activities regarding "feral cats" at her home, and Rossell testified about having feral cats in her house, which had become domesticated.[48] She stated that her "feral cats" were wild but are not now as she "can pet most of them."[49]

It appears to me that there is not always a bright line between whether a cat is domesticated or feral. The characteristics of a cat that define it as one or the other may change depending upon the circumstances of the cat's life. Some cats are cared for inside a home throughout their lives and are clearly "domesticated." Others are feral – or wild – throughout their lives, living outside in colonies in fear of contact with humans. However, there are cats, such as stray domesticated cats, that may be abandoned by their owners and straddle the line between feral and domesticated cats.

Considering all of the evidence, I find the Association has not met its burden of

---

[46] Trial Tr. 158: 6-11; 159: 14-18.

[47] Trial Tr. 161: 18-20.

[48] Trial Tr. 25: 6-7, 149: 11-16. She also spoke about the cats living in her garage as "not being domesticated," but not being "wild," either. Trial Tr. 28: 8-11.

[49] Trial Tr. 217: 19-22.

17

showing that Rossell has violated Section 5. The evidence shows that Rossell's cats, in general, are sufficiently comfortable with human contact to enter her garage to seek shelter, go up on her porch to eat, and to be petted by her; they do not demonstrate the extreme fear and resistance to human contact consistent with feral cat behavior. Although Rossell and the TNR expert referred to Rossell's cats as "feral" at times in their testimony, when I compare their views on the differences between feral and domesticated cats and their descriptions of her cats, I conclude that, based upon the evidence presented, Rossell's cats are generally "stray domesticated" cats that are, mostly, living in her garage – or under the same "roof" as Rossell. Therefore, I recommend that the Court find that Section 5 does not prohibit Rossell from keeping the cats. [50]

---

[50] The Association, in its exceptions, argues that Rossell's cats are feral and that the report's conclusion that they are stray domesticated cats is contrary to testimony from both Rossell and the TNR expert. Admittedly, both witnesses referred to Rossell's outside cats as "feral" at times, although the TNR's description of a feral cat ("you cannot touch a feral [cat]") and Rossell's descriptions of the cats' behavior and her interactions with them (they are not "wild" and she can pet them) demonstrate an inconsistency between Rossell's cats' behavior and feral cats' temperament, which is defined in the Delaware Code as a temperament of "extreme fear and resistance to contact with humans." Trial Tr. 158: 10-13; 217: 19-22; *see* 16 *Del. C.* §3013F(i). The Association, in its exceptions, asserts that Rossell's testimony is unreliable regarding her cats because of her partiality and emotions. D.I. 82, at 9, n. 5. This case involves intense emotions, but evidence was not presented refuting Rossell's credibility concerning her descriptions of her cats' behavior. Also, even if some of Rossell's cats are considered feral, I do not find that Section 5 prohibits her activities related to the cats. The Association argues that "keeping" a cat is defined under Delaware law as having possession or control of the cats and, since Rossell does not have possession or control of the cats, she is not a "keeper" of the cats and the cats are feral. *Id.*, at 11, n. 7. If Rossell is not keeping the feral cats, then Section 5 is not implicated, because Section 5 only addresses cats that are "kept."

## C. Nuisance

The next issue focuses on whether Rossell, through her TNR activities and feeding and housing multiple cats on her property, has violated Section 2 by creating a nuisance. Section 2 prohibits the use of "any Lot which creates a nuisance or which is dangerous or offensive to the neighborhood."[51] I conclude the Association has not shown that Rossell's actions on her property have created a nuisance in violation of the deed restrictions.

As discussed previously, as of February of 2018, Rossell was feeding and providing shelter to approximately 28 cats on her property. That number is decreasing (down from 40 cats at the time of her deposition) as her cats, which are all spayed or neutered and older, die.[52] Rossell conducts trap, neuter and release activities on cats on her property.[53] Rossell testified that she traps the cats, works with a TNR organization to take the cats to be spayed or neutered and vaccinated and, once they have recovered from the surgery, releases the cats back onto her property.[54] Rossell testified that she began her TNR activities because she wanted to "keep the

---

[51] D.I. 1, Ex. A, Art. II § 2.

[52] Rossell testified that all of her cats have been spayed or neutered, cannot have kittens, and are 12 years of age of older. Trial Tr. 197: 1-4.

[53] There was no evidence that Rossell is trapping cats elsewhere, neutering them and releasing them on her property. The TNR expert testified to seeing cats "coming from the farms from behind [Quail Village]." Trial Tr. 149: 3-4.

[54] Rossell also testified that she has spent over $20,000 on the cats. Trial Tr. 195: 19-24.

[cat] population down."[55]  The TNR expert opined that Rossell's activities "definitely decrease" the feral cat population at Quail Village and are beneficial to the community.[56]  She further stated that if you stop feeding feral cats, they do not move away but stay in the colony, hunting and "dumpster diving."[57]  She also testified that feral cats roam the community and, if they have not been vaccinated for feline leukemia, can expose other outside cats to that contagious and dangerous disease.[58]

The evidence showed that the Association has received complaints from homeowners with property near Rossell about the cats' intrusion onto their property, spraying and defecating, for years.[59]  Rossell's neighbor, Carrie Bush ("Bush"), who lives two doors down from Rossell, testified that she complained to the Association about the cats, starting approximately 10 years ago, when multiple cats began invading her property on a regular basis – defecating in her yard so that she has "had to wash poop off [her children's] sneakers in the sink many, many times," and destroying her property, including tearing up her children's play set, getting into her

---

[55] Trial Tr. 192: 12-13.

[56] Trial Tr. 155: 16-23.

[57] Trial Tr. 156: 12-157: 5.

[58] Trial Tr. 166: 20-24.

[59] Tullis referred to complaints from the neighbors about the cats, stating that the complaints had not abated, although he testified he had walked around the neighborhood the day before the trial and "did not see any cats at all in [Rossell's] yard." Trial Tr. 51: 2-7; 59: 14-21; 62: 5-10.  Marianne Magee testified concerning complaints about the cats and a meeting with Rossell and Board members about those complaints in the past when she was serving as Association president between 2011 and 2013. Trial Tr. 130: 4-6; 132: 13-19; 134: 2-6.

garage and screened porch and breaking through the porch screen to get out.[60] She testified cats also have gotten into her house on three occasions, including one time when a cat got into a second floor closet, and another time when a cat urinated on the rug on the second floor of her home.[61] Bush further stated that, originally, she didn't know where the feral cats were coming from – that there "used to be an Amish farm behind the woods," and she didn't know if they "vacated and left their cats."[62] She described the cats as "wild cats."[63] She also testified that there have been litters of kittens left on her property in the last year.[64] The neighbor's testimony did not establish that the cats complained about came from the Rossell property.

Further, there was testimony by Rossell and the TNR expert that there are other cats in the community that are not spayed or neutered.[65] Rossell testified that the kittens that were on Bush's property in the last year were not hers, since all of her cats were spayed or neutered and unable to have kittens, and that there is a barrier – a

---

[60] Trial Tr. 178: 18-23; 179: 5-9; 186: 10-20; 188: 5-7.

[61] Trial Tr. 179: 15-23; 180: 5-19.

[62] Trial Tr. 182: 3-8. Bush testified that she tried trapping the cats to take them to the SPCA but stopped when the SPCA refused to take them. Trial Tr. 182: 9-20.

[63] Trial Tr. 184: 11-12.

[64] Trial Tr. 187: 8-10.

[65] Trial Tr. 33: 1-8; 148: 7 - 149: 10. In response to the Association's exceptions, the body of the report was modified to eliminate references to testimony concerning a specific neighbor's cats.

reservoir filled with water up to eight feet deep – located between her property and Bush's property.[66]

Nuisance is not defined in the deed restrictions, so I look to Delaware law. Delaware courts recognize public nuisances and two types of private nuisances. A public nuisance claim is based upon an "unlawful act . . . that endangers the lives, safety, health or comfort of the public."[67] I do not find public nuisance is applicable in this situation, since only Rossell's close neighbors are involved in this matter.[68]

There are two types of private nuisance recognized in Delaware. The doctrine of nuisance *per se* is an intentional interference with another's property rights, or an

---

[66] Trial Tr. 196: 7-9; 197: 1-4; 210: 7-14. The Association, in its exceptions, points out that Rossell testified that she released three of her kittens from a trap on the Bush property so there was testimony that Rossell's cats were on the Bush property. D.I. 82, at 9, n. 5. Rossell's testimony also indicated that the incident with the kittens occurred approximately 10 years ago. Trial Tr. 30: 4-7. There was no testimony directly linking more recent cat problems occurring on Bush's property with cats kept by Rossell. Also, the Association's exceptions question the report's statement that Rossell testified that the reservoir between her property and the Bush property was filled with water eight feet deep, indicating that there was not "necessarily 8 feet of water in the reservoir all the time." D.I. 82, at 9, n. 5. Rossell testified that there was a barrier between her house and the Bush's property, which was "a reservoir that runs between both houses with water in it." Trial Tr. 210: 7-10. She also testified that the reservoir was "probably maybe eight feet deep," and always has water in it. Trial Tr. 210: 12-14. I have modified the report to reflect the distinction.

[67] *Walker v. Williams*, 2016 WL 3569260, at *6 (Del. Ch. June 23, 2016); *Lechliter v. Del. Dep't of Nat. Res. & Envtl. Control*, 2015 WL 9591587, at *17 (Del. Ch. Dec. 31, 2015), *aff'd,* 146 A.3d 358 (Del. 2016) ("A public nuisance is a nuisance that 'affects the rights to which every citizen is entitled.'").

[68] *Cf. Walker*, 2016 WL 3569260, at *6. Only Bush testified as to the direct effect on her and the complaints about cats came from neighbors. Tullis testified that he lives 10 lots away from Rossell and he was not aware of cats defecating in his yard. Trial Tr. 69: 20 - 70: 4.

interference resulting from "abnormally hazardous activities" conducted on the person's property, or an interference in violation of a statute intended to protect public safety.[69] That doctrine is inapplicable here because Rossell's activities – in feeding and sheltering cats and engaging in TNR activities – are lawful and there is no evidence that her activities are abnormally hazardous or that she is intentionally interfering with her neighbors' property rights. The other type of private nuisance is nuisance-in-fact, which exists when a person, acting lawfully on her own property, permits acts or conditions that "become nuisances due to circumstances or location or manner of operation or performance."[70] In other words, a person's use of their property "constitutes an unreasonable invasion of their neighbor's property rights," and interferes with their neighbor's reasonable enjoyment of their property, when the facts are considered from an objective point of view."[71] Reasonableness is usually determined by "balancing the seriousness of the inconvenience, annoyance or harm produced by the complained of use against the fitness or utility of the use causing the harm."[72]

---

[69] *Walker*, 2016 WL 3569260, at *6; *Beam v. Cloverland Farms Dairy, Inc.*, 2006 WL 2588991, at *2 (Del. Ch. Sept. 6, 2006).

[70] *Beam*, 2006 WL 2588991, at *2.

[71] *Walker*, 2016 WL 3569260, at *6.

[72] *Fenton v. Longwill*, 1987 WL 19559, at *3 (Del. Ch. Nov. 5, 1987).

There do not appear to be any nuisance cases in Delaware involving cats. The only nuisance case about animals I found in Delaware involved a complaint about 25-30 barking dogs cared for by a neighbor. In that case, for a nuisance to warrant injunctive relief, the Court held the plaintiff must "clearly establish that he suffers substantial harm," and that the barking dogs, which were located in a remote area and did not bark constantly, did not constitute a nuisance.[73]

The evidence shows that cats on Bush's property have caused inconvenience and interfered with her reasonable enjoyment of her property. The many occurrences of cats coming onto Bush's property, defecating and destroying her property, unreasonably affects her property rights. The issue, however, is whether Rossell's actions on Rossell's property have caused Bush's problems. The nexus between Rossell's activities and Bush's cat issues has not been established by a preponderance of the evidence. Rossell feeds and provides shelter to cats, and conducts TNR activities, on her property. There was no testimony that she is capturing and bringing cats to her property, or that it was definitely her cats that were entering onto Bush's property and causing the problems Bush is experiencing. Rossell testified about the

---

[73] *Boyd v. Clough*, 1980 Del. Ch. LEXIS 600, at *10, *14 (Del. Ch. Aug. 7, 1980). The *Boyd* Court acknowledged that "every person has the right to require a degree of quietude which is consistent with the standard of comfort prevailing in the locality wherein he lives," but concluded that "no one is entitled to absolute quiet." *Id.,* at *10-*11.

24

reservoir located between her and the Bush's properties, which serves as a barrier restricting access between the properties by her cats. And, the evidence showed that there are other cats outside in the community, besides Rossell's cats. Bush's testimony that she had kittens left on her property in the past year indicates that the cats on her property that are causing problems may not be Rossell's, since all of Rossell's cats have been spayed and cannot have kittens. Further, the testimony showed that Rossell's TNR activities help to reduce the feral cat population in the community overall. I appreciate the burden that the neighbors are suffering due to cats in their neighborhood, but the evidence hasn't shown that Rossell shoulders the blame for those problems. Accordingly, I conclude that the Association has not met its burden of proving that Rossell acted to cause, or permitted the conditions causing, the problems with cats that Bush is experiencing.

## D. Waiver or abandonment of enforcement of deed restrictions

Rossell asserts that the Association enforced deed restrictions as to structures on other properties in an arbitrary and capricious manner, thereby waiving or abandoning its ability to enforce the restrictions based upon equitable principles, and that the Association should pay her attorneys' fees.

A waiver of deed restrictions usually involves a failure to object to other violations of the same or similar restriction "such that it would be unfair to allow the

claimant to enforce the [restriction] against the current violation."[74]  Abandonment is difficult to establish but occurs when all beneficiaries relinquish their right to enforce a restriction, which can result from extensive waiver.[75]  Rossell bears the burden of proof on her affirmative defense of waiver, and the ability to preclude enforcement due to waiver occurs only to the extent of the waiver she demonstrates.[76]  If waiver is not shown for a particular deed restriction, then it remains in effect.

Rossell has not met her burden of showing a waiver of the Association's enforcement of the deed restriction violations claimed against her.  The only waiver at issue here (the only restriction that I upheld against Rossell) related to the restrictions' prior approval requirement for building or improving structures.  To prove waiver, Rossell would need to show that the Association had not required other homeowners to seek prior approval for the construction of buildings to such an extent that it would be unfair for it to enforce the approval requirement against her.  The evidence does not support such a conclusion, since Tullis, a former ARC chair and member, testified about ARC's review of other homeowners' requests seeking ARC

---

[74] *Tusi v. Mruz*, 2002 WL 31499312, at *3 (Del. Ch. Oct. 31, 2002); *Warwick Park Owners Ass'n, Inc. v. Sahutsky*, 2005 WL 2335485, at *4 (Del. Ch. Sept. 20, 2005).

[75] *Tusi*, 2002 WL 31499312, at *3; *see also Henderson v. Chantry*, 2003 WL 139765, at *3 (Del. Ch. Jan. 10, 2003).

[76] *Tusi*, 2002 WL 31499312, at *4.

approval prior to making improvements on their property.[77] Rossell presented some testimony at trial concerning instances where garages and other structures, such as pool houses, in Quail Village have been built in apparent violation of the deed restrictions, but that evidence did not focus on the Association's waiver of the prior ARC approval restriction. I recommend the Court decline to find that Rossell has met her burden of demonstrating a waiver of enforcement of deed restrictions in this case.

### E. Attorney's fees

The Association and Rossell both seek an award of attorney's fees under 10 *Del. C.* § 348(e). I recommend that the Court decline to shift fees under 10 *Del. C.* § 348(e) for either side. The Association brought this action under 10 *Del. C.* § 348, which applies to actions "involving the enforcement of deed covenants or restrictions."[78] Section 348 includes a fee-shifting provision reversing the ordinary American Rule that parties bear their own costs and attorneys' fees, by providing that "[t]he nonprevailing party at a trial held pursuant to the provisions of this section must pay the prevailing party's attorney fees and court costs, unless the court finds that enforcing this subsection would result in an unfair, unreasonable, or harsh

---

[77] Trial Tr. 71:17-73:1. Tullis testified that ARC's responses – denial or approval – to requests are typically sent in a memorandum to the requestor, but that some ARC records are not available because he maintained ARC records on his computer while he was on ARC, and his computer crashed. Trial Tr. 72: 18-22; 91: 9-20.

[78] 10 *Del. C.* § 348(a).

27

outcome."[79] The Association focuses its argument for attorney's fees on Rossell's actions allegedly causing a nuisance, her unwillingness to come to terms with her neighbors, and the fact that the case was "aggressively litigated, largely due to the Affirmative Defenses asserted by [Rossell]."[80] Rossell asserts that she should receive attorney's fees because her TNR efforts benefit the community and she was attacked, rather than supported, for a "problem she did not create," and that the only problem with the accessory structure involved "paperwork."[81] Further, she claims she has "already paid to be sued," since her Association dues helped to fund this "unnecessary litigation."[82]

The purpose of 10 *Del. C.* § 348(e) is to subject parties to disputes "to the risk that they will pay both sides' costs if they [lose]."[83] And section 348 was likely "designed to encourage residents to voluntarily comply with restrictive covenants and homeowners associations to be reasonable in enforcing such covenants."[84] It appears to me that both parties aggressively litigated this action. In this report, I recommend the Court find, in part, for the Association (as related to Rossell's violation of the

---

[79] 10 *Del. C.* § 348(e). *See Swann Keys Ass'n v. Shamp*, 2008 WL 4698478, at *1 (Del. Ch. Oct. 10, 2008), *aff'd*, 971 A.2d 163 (Del. 2009), *as corrected* (Mar. 26, 2009).

[80] D.I. 76, "Remedy Sought by Pet'r, Couns. Fees."

[81] D.I. 77, at 11-12.

[82] *Id.* at 12.

[83] *Swann Keys Ass'n*, 2008 WL 4698478, at *1.

[84] *Id.*

deed restriction requiring prior approval of structures) and, in part, for Rossell (denying allegations that she caused a nuisance and kept undomesticated cats in violation of the deed restrictions). Given that split, I find it reasonable to conclude that neither party has prevailed for purposes of 10 *Del. C.* § 348(e) and I recommend that the Court decline to shift fees for either side.

## III.    Conclusion

For the reasons set forth above, I recommend the Court determine that Rossell failed to comply with the deed restrictions' requirement that she seek approval from ARC prior to building the accessory structure on her property, and grant injunctive relief requiring Rossell to submit a request for ARC review of the accessory structure on her property within 30 days after this report becomes final, ARC to review and decide regarding approval of the structure within 30 days following the filing of that request, and keeping this case open for 90 days after this report becomes final to allow this Court to retain jurisdiction in the event that the process detailed above leads to additional disputes regarding Rossell's accessory structure. I further recommend the Court find that Rossell has not violated the deed restrictions concerning the keeping of cats, or by causing a nuisance, or dangerous or offensive conditions. And that the Court decline to find a waiver of enforcement of deed restrictions has been proven in this case, or to shift fees for either side under 10 *Del. C.* § 348(e).

29

Finally, I acknowledge that this dispute between neighbors remains unresolved – with one homeowner believing she is acting for the betterment of the community as a whole, while her neighbors are feeling oppressed by the circumstances involving cats intruding onto their property. Reasonable accommodations and sensitivities to all perspectives will be instrumental to quelling this dispute in the future. I end with a similar statement as the one by the *Boyd* Court regarding the barking dogs – I hope that Rossell will "show consideration for the feelings of others, and to that extent not add to [her cats]."[85] Her mission in trying to reduce the number of cats that are not spayed or neutered is a laudable one, but there are constraints associated with living in a development. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

---

[85] *Boyd v. Clough*, 1980 Del. Ch. LEXIS 600, at *14 (Del. Ch. Aug. 7, 1980).