# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LOUIS J. CAPANO, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0410-KSJM |
| | ) | |
| DRAPER SUBDIVISION | ) | |
| ASSOCIATION, INC., DRAPER | ) | |
| SUBDIVISION ARCHITECTURAL | ) | |
| REVIEW COMMITTEE, and JOHN | ) | |
| BURKE, TOM GASPARD, and | ) | |
| BRUCE HARWOOD solely in their | ) | |
| capacity as members of the | ) | |
| ARCHITECTURAL REVIEW | ) | |
| COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Dated Submitted: May 30, 2019
Date Decided: August 20, 2019

Kelly E. Farnan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Plaintiff Louis J. Capano, III*.

Megan T. Mantzavinos, Marc Sposato, MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, Delaware; *Counsel for Defendants Draper Subdivision Association, Inc., Draper Subdivision Architectural Review Committee, and John Burke, Tom Gaspard, and Bruce Harwood in their capacity as members of the Architectural Review Committee*.

David A. Dorey, Blank Rome LLP, Wilmington, Delaware; *Co-counsel for Defendants Draper Subdivision Association, Inc. and Draper Subdivision Architectural Review Committee*.

**McCORMICK, V.C.**

Delaware is known for more than its corporate law. Peppered along the famed Delaware beaches, as its southernmost twenty-five miles of coast is called,[1] are private communities that enjoy exclusive ocean views. This litigation concerns one particularly prized oceanfront community—the Draper Subdivision.

In 2002, Louis J. Capano, Jr. purchased a lot in the Draper Subdivision for his son, Louis J. Capano, III, who is the plaintiff in this action. The Capanos were drawn to the lot's view of Silver Lake to the west and what they viewed as comparatively few building restrictions. These restrictions appeared to allow the Capanos to build on the ocean side of the lot up to a line established by Delaware's Department of Natural Resources and Environmental Control ("DNREC"). To explain, the Atlantic's beating crests can make rapacious neighbors. To protect the coastline's human and other inhabitants, DNREC imposes ocean-side building restrictions on coastal plots. The DNREC ocean-side restrictions governing the Draper Subdivision are memorialized in the recorded plot plans and a declaration of restrictive covenants.

Prior to the Capanos' purchase, certain owners in the Draper Subdivision had informally agreed to make the ocean-side setbacks more restrictive in order to

---

[1] In 2003, the Delaware Senate passed a resolution urging the Governor of Delaware to direct the Secretary of Transportation to change state signage to refer to the coastal area of Delaware as the "Delaware beaches," as opposed to the "shore." S. Res. 15, 142nd Gen. Assemb. (Del. 2003). Thereafter, Delaware's Department of Transportation changed traffic signage to direct motorists to the "Beaches" instead of "Shore Points."

preserve their ocean views. For some lots, this meant extending the setback 30 feet landward of the DNREC line. A collection of owners built to those more restrictive standards. They also tried three times to amend the community's declaration of restrictive covenants. They failed all three times to secure the written signatures required to amend the declaration. They ultimately gave up. Thus, the declaration reviewed by the Capanos when they purchased their lot did not reflect the informal agreement.

In late 2017, the plaintiff submitted building plans for approval by the Draper Subdivision's architectural review committee. The plans conformed to the express restrictions in the declaration. Yet, the committee rejected the plans because they failed to conform to community members' informal agreement regarding ocean-side setbacks. The defendants say that a 30-foot ocean-side setback for the plaintiff's lot is essential to preserve Draper Subdivision residents' unobstructed views of the ocean. But that restriction would reduce the buildable land on the plaintiff's lot by nearly 20 percent. Thus, the plaintiff pressed the committee to reconsider enforcement of their informal agreement.

The parties first endeavored to compromise, as neighbors should. Those efforts failed, and the plaintiff commenced this litigation pursuant to Delaware Code Title 10, Section 348. The parties then attempted to mediate their dispute, as Section 348 requires. When mediation efforts failed, the case was set for trial.

2

By the time of trial, the sole issue before the Court was whether the community members' informal agreement gave rise to an equitable servitude by implication. Delaware policy favors the free use of land. Thus, the doctrine of implied servitudes applies in a limited circumstance: to enforce a written restriction that has been unintentionally omitted from one of several similarly-situated deeds. To prevail on this theory, the servitude's proponent must demonstrate by clear and convincing evidence that a common plan including the servitude existed at the time the subdivision was first recorded and thereafter as lots were sold.

At trial, the defendants did not meaningfully attempt to meet this standard. They provided no evidence that when the Draper Subdivision was first recorded there existed a common plan of development that included additional setbacks from the DNREC line, much less the specific 30 foot ocean-side setback for the plaintiff's lot that the defendants seek to enforce. This post-trial decision therefore enters judgment in favor of the plaintiff.

## I. FACTUAL BACKGROUND

The facts are drawn from the pre-trial order and the record presented during a two-day trial held from January 16, 2019 to January 17, 2019.[2] The trial record consists of 138 exhibits,[3] live testimony from five witnesses, and lodged testimony in the form of six deposition transcripts. The following facts were stipulated by the parties or proven by a preponderance of the evidence.

### A. The Draper Subdivision

The Draper Subdivision, formally known as the "Subdivision of Lands of the Estate of Irene Carpenter Draper," is oceanfront property located between Silver Lake and the Atlantic Ocean, outside of the City of Rehoboth Beach, Delaware.[4] The Draper Subdivision was created from the Estate of Irene Carpenter Draper.[5] In 1995, the estate's executor filed a plot plan for the Draper Subdivision in the Office

---

[2] This decision cites to docket entries by docket ("Dkt.") number, the trial transcript (Dkts. 79–80) ("Trial Tr."), stipulated facts set forth in the parties' pre-trial stipulation and order (Dkt. 74) ("PTO"), trial exhibits (by "JX" number), and the deposition transcripts ("Dep. Tr.") of Tom Gaspard, John Burke, Bruce Harwood, Jack Griffin, Louis J. Capano, III, and Louis J. Capano, Jr. (Dkt. 70).

[3] The parties dispute the admissibility of certain exhibits and trial testimony. *See* Dkt. 87, Pl.'s Opening Post-Trial Br. ("Pl.'s Opening Br.") at 46–50; Dkt. 89, Defs.' Mot. in Lim. to Exclude Certain Exs. and Related Trial Test. Pursuant to D.R.E. 403, 701 and 702; Dkt. 92, Defs.' Post-Trial Answering Br. ("Defs.' Ans. Br.") at 53–63; Dkt. 94, Pl.'s Opp'n to Defs.' Mot. in Lim.; Dkt. 95, Pl.'s Post-Trial Reply Br. at 25–26. For any disputed exhibits and related testimony relied upon by this memorandum opinion, the parties' objections are addressed. For disputed exhibits and testimony not relied upon, the parties' objections are moot.

[4] *See* PTO ¶ 17.

[5] *Id.* ¶ 18.

4

of the Recorder of Deeds in and for Sussex County, dividing the Draper Subdivision into eight separate lots.[6] In 2014, Lot 1 was subdivided into two lots, Lots 1A and 1B.[7] There are now nine lots in the Draper Subdivision, running north to south from Lot 1A to Lot 8.[8]

### B. The Original Declaration

In 1995, the estate's executor filed the Declaration of Restrictive Covenants, Reservations and Remedial Clauses of the Subdivision of Lands of the Estate of Irene Carpenter Draper (the "Original Declaration").[9] The Original Declaration imposed a set of restrictive covenants on the Draper Subdivision.

Among its restrictive covenants, the Original Declaration contains a section governing "BUILDING SET-BACK LINES."[10] That section adopts the DNREC line as the ocean-side setback line (a/k/a the "rear yard set-back line").[11] "The rear yard set-back line thereof shall be the building restriction line established by [DNREC] as designated on the recorded Plot Plan . . . ."[12] All recorded documents

---

[6] *Id.*

[7] *Id.* ¶ 19.

[8] *See* JX 2; JX 33 at 4.

[9] JX 1.

[10] *Id.* ¶ 10; *see also id.* ¶ 4.

[11] *Id.* ¶ 10.2; *see also id.* ¶ 4.

[12] *Id.* ¶ 10.2.

including the plot plans for the Draper Subdivision show the DNREC line as the ocean-side setback line.[13]

The Original Declaration created a homeowners association called the Draper Subdivision Association (the "Association").[14] It also created an Architectural Review Committee ("Committee") to "insure the development and maintenance of the Draper Subdivision as a residential development of the highest standards."[15] The Original Declaration vests the Committee with the "power to control all matters relating to all buildings, structures, or improvements to be placed upon any lot or other land area, except Lot 1."[16] The Original Declaration further provides that Committee decisions "shall be made by majority vote of the Committee members," but the Association as a whole may overrule Committee decisions.[17]

The Association is empowered to amend the Original Declaration's terms through "the vote or written consent of no less than sixty-six percent (66%) of the then owners of all the numbered lots in the DRAPER SUBDIVISION."[18] Any such amendment will take effect

---

[13] *See* JX 2; JX 33 at 4; Dep. Tr. of Gaspard at 85:18–21.

[14] JX 1 ¶ 22.

[15] *Id.* ¶ 7 (formatting omitted).

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 26.

when a copy thereof, executed and acknowledged by the DRAPER SUBDIVISION Association, or its successors, in accord with the usual form of execution and acknowledgment of deeds to land, together with the written consents of the requisite number of numbered lot owners, or a certificate by the Association, or its successors, verified under oath by the President thereof, . . . setting forth the time, manner, and results of the taking of the vote of all the numbered lot owners of the DRAPER SUBDIVISION having been filed for record in the Office of the Recorder of Deeds, in and for Sussex County, at Georgetown, Delaware[.][19]

### 1. Certain lot owners informally agree to an ocean-side setback beyond the DNREC line.

Defendant Tom Gaspard's family purchased Lot 7 in 1996.[20] The Gaspards were among the first of the lot owners to build on their property.[21] In designing his family's home, Gaspard desired to preserve the ocean views.[22] Inspired by his neighbors' decisions to build on Lot 5 and Lot 3 houses 30 feet back from the DNREC line, Gaspard and his architect developed the concept of setting the main structure of his and other Draper Subdivision houses further back from the DNREC line on a separate diagonal line.[23] This diagonal line, referred to in the defendants' briefing as the "Draper Line," roughly tracked the bend in the DNREC line and was

---

[19] *Id.*

[20] Trial Tr. at 152:11–24 (Gaspard).

[21] *See id.* at 154:3–24 (Gaspard).

[22] *Id.* at 159:18–160:2 (Gaspard).

[23] *Id.* at 157:14–22, 160:3–163:2 (Gaspard); *see also* JX 6 at 1–2.

7

intended by Gaspard to be a setback for walled, roofed-over structures.[24]  Around 1997, Gaspard began approaching his neighbors to secure their approval of the Draper Line setback.[25]  According to the defendants, by August 1997, at least three other families had agreed to Gaspard's proposal and one other family had built consistent with the proposal.[26]

### 2. Certain lot owners engage in multiple failed attempts from 1998 through 2000 to amend the Original Declaration's ocean-side setback.

In the late 1990s, certain Draper Subdivision lot owners attempted to amend the Original Declaration to make the setbacks on both the ocean- and lake-sides more restrictive.[27]  This effort was initiated in April 1998, with a memorandum from the Committee to the lot owners regarding "Oceanfront Building Setback."[28]  The memorandum outlined the impact of the existing restrictions in the Original Declaration, stating "there is no restriction on an owner in our Subdivision erecting a 42' high house right on the DNREC line."[29]  Citing a desire to "ensure optimal oceanfront sight lines[,]" the Committee, consisting of Gaspard, Jack Griffin, and

---

[24] *See* JX 6 at 2; JX 27 at 2; Defs.' Ans. Br. at 7 & n.2.

[25] Trial Tr. at 162:24–163:9 (Gaspard); JX at 5.

[26] Defs.' Ans. Br. at 8 (first citing JX 5, and then citing Trial Tr. at 162:24–163:5 (Gaspard)).

[27] *See* Trial Tr. at 165:14–178:22 (Gaspard); Dep. Tr. of Gaspard at 146:14–147:23.

[28] JX 6.

[29] *Id.* at 1 (formatting omitted).

8

Larry Silverman, proposed amending Paragraph 10.2 of the Original Declaration by inserting the following underlined language designed to memorialize the "Draper Line":

> The rear yard set-back line thereof shall be the building restriction line established by the Department of Natural Resources and Environmental Control as designated on the recorded Plot Plan of the DRAPER SUBDIVISION <u>as pertains to decks and the following minimum distances from this line for any walled structure, ie, house, porch, or roof as shown in Exhibit A attached and made a part of these Covenants:</u>
>
> <u>Lot 1:  Existing Structure or 35', Lot 2:  35', Lot 3:  30', Lot 4:  30', Lot 5:  30', Lot 6:  27', Lot 7:  24', [Lot 8]:  21'</u>[.][30]

The Committee requested that, if in agreement, owners sign and return the signature page of the memorandum.[31]

In response to the April 1998 memorandum, Gaspard received a memorandum from non-party Dominick Pulieri, who then owned the lot at issue in this litigation—Lot 2—as well as Lot 1.  Pulieri's memorandum effectively rejected the Committee's proposal of a 35' setback for Lots 1 and 2 and made a counteroffer of no setback for Lot 1 and a 30' setback for Lot 2.[32]

---

[30] *Id.* at 2 (underlining in original); *see also* PTO ¶ 31.

[31] JX 6 at 2; *see also* Trial Tr. at 129:15–19 (Gaspard).

[32] JX 8; Dep. Tr. of Gaspard at 127:8–12.  Prior to this litigation, Pulieri's memorandum was never provided to plaintiff Louis J. Capano, III or his father, Louis Capano, Jr.  Dep. Tr. of Gaspard at 127:21–128:6; *see also* Trial Tr. at 7:12–20 (Capano, Jr.); Trial Tr. at 340:24–342:22 (Griffin).

Gaspard collected four signature pages approving the April 1998 memorandum,[33] although their late production in this litigation made it difficult for the plaintiff to probe the evidentiary value of those signature pages.[34] Gaspard seems to recall further obtaining the agreement of one other owner by email.[35] Of the four late-produced signature pages, only one addressed Pulieri's counteroffer. Specifically, the signature page signed by Griffin included a handwritten note stating, "P.S. Lot 1 @ No Agmt & Lot 2 @ 30 FT is acceptable. If best we can do."[36]

In July 1998, the Committee circulated another memorandum to the lot owners regarding the ocean-side setbacks.[37] The memorandum informed the lot owners that the proposed ocean-side setbacks required the approval of a "two-thirds majority" and further proposed an increased lake-side setback.[38] With the

---

[33] *See* Trial Tr. at 170:22–172:17 (Gaspard); JX 7 (Lot 7's Gaspard); JX 9 (Lot 5's Silverman); JX 10 (Lot 3's Griffin); JX 11 (Lot 4's Williamson).

[34] Prior to trial, Gaspard, as Defendant Draper Subdivision Association, Inc.'s 30(b)(6) witness, testified that he did not have any signature pages. He specifically testified: "I don't have them. . . . I don't have a straight recollection at the moment of how many there are. I expect there is at least one." Dep. Tr. of Gaspard at 126:5–17. Gaspard later found signature pages in his files and produced them. Despite the late production of these documents, and the plaintiff's well-founded hearsay objection, the plaintiff's objections are overruled. These documents are admitted and considered for the truth of the matter asserted.

[35] Trial Tr. at 172:18–173:4 (Gaspard).

[36] JX 10.

[37] JX 12.

[38] *Id.*

memorandum, the Committee purported to enclose documents necessary to formally amend the Original Declaration as to both the ocean-side and lake-side setbacks and record the changes in the Original Declaration and Draper Subdivision plot plan.[39] Gaspard testified that formally recording amendments was "important to do."[40] No signature pages were returned in response to the July 1998 memorandum.[41]

The Association discussed the proposed setbacks at the Committee's annual meeting held in August 1998.[42] Owners for five of the (then eight) lots were present at the meeting.[43] The minutes of that meeting noted that the "proposed changes in Covenants – ocean-side setbacks, lake-side set back, [and] sight lines . . . were endorsed by all present," but recorded specific comments to be incorporated in any revised proposed amendments.[44] The minutes further noted that "it was decided *to await any comments from Dominick Pulieri before redrafting the Covenants*[.]"[45]

In October 1998, the Association sent out another memorandum enclosing the revised proposed amendments and a signature sheet for lot owners to indicate their

---

[39] *See id.*

[40] Trial Tr. at 128:6–12 (Gaspard).

[41] *See id.* at 129:20–23 (Gaspard).

[42] *See* JX 13 at 1; Trial Tr. at 129:24–130:2 (Gaspard).

[43] JX 13 at 1; *see also* Trial Tr. at 130:7–14 (Gaspard).

[44] JX 13 at 1.

[45] *Id.* (emphasis added).

11

approval based on comments made at the August 1998 annual meeting.[46]   The memorandum stated that "[o]nce we receive these signatures back, the amendment documents will be officially recorded."[47]   The amendments proposed in October 1998 were never signed or officially recorded.[48]

The Association made another effort to amend the Original Declaration's covenants in 1999.  The minutes of the Association's 1999 annual meeting state: "The substance of the proposed changes in Covenants – ocean and lake-side set backs . . . have been strongly endorsed by most members, but remained unapproved by the necessary two-thirds majority."[49]   Again, it was noted that follow-up with Pulieri would be attempted.[50]

The Association tried again in 2000.  Once more, Pulieri's failure to agree was specifically noted in the Association's annual meeting minutes:

> We again (as at both prior annual meetings) discussed [covenant modifications] at length, particularly the need to ensure the value of our properties via formal ocean and lakeside setback lines.  While we have been unsuccessful in securing the approval of Lots 2 and 6 (Dominick

---

[46] JX 15.

[47] *Id.*

[48] *See* Dep. Tr. of Gaspard at 145:22–148:13 (pointing to receipt of signatures only in response to the Association's April 1998 memorandum, not the Association's October 1998 memorandum); Dep. Tr. of Griffin at 48:19–49:15 (acknowledging that any proposed amendments in 1998 were not recorded); *see also* PTO ¶ 27.

[49] JX 18 at 2.

[50] *Id.*

[Pulieri] being unreachable and Marty [Schoffstall] abstaining) . . . .[51]

Following the 2000 annual meeting, the Association had counsel draft revised covenants.[52] In an effort to secure sufficient agreement from lot owners, the signature page on the proposed revised covenants provided that the "consent is made under the assumption that there will be the consent of at least sixty-six percent (66%) of the owners of all lots in Draper Subdivision, which majority is necessary to effect changes in the Declaration."[53] There are no signed copies of this version of the document.[54]

None of the above-recounted efforts succeeded in amending the Original Declaration.[55] The minutes of the Association's 2001 annual meeting reflect: "Last year's resolve to informally (lacking a necessary majority to formally modify) sign the covenant modifications proceeded [through] the drafting phase, including review by counsel, but has not progressed further due [to] a reconsideration by some members. We will continue to seek formal adoption of setback line changes."[56]

---

[51] JX 20 at 2.

[52] *See* JX 19; Trial Tr. at 135:1–8, 149:24–150:7 (Gaspard).

[53] JX 19 at 7.

[54] Trial Tr. at 140:2–141:1 (Gaspard); Dep. Tr. of Gaspard at 151:20–152:4, 153:9–14.

[55] *See* PTO ¶ 30; *see also* JX 37 (stating that "we simply couldn't get enough votes").

[56] JX 21 at 1.

### 3. The lot owners successfully amend the Original Declaration in 2014, but do not amend the provision concerning ocean-side setbacks.

In December 2014, the Association approved and recorded an amendment to the Original Declaration (the "2014 Amendment" and together with the Original Declaration, the "Declaration").[57] The 2014 Amendment made Lots 1A and 1B subject to the Declaration and accomplished other changes, including modifying the Declaration's provision concerning building materials.[58] The 2014 Amendment provides that "[e]xcept as amended hereby, all of the terms, covenants and conditions of the Restrictive Covenants [i.e., the Declaration] shall remain in full force and effect."[59] Along with the 2014 Amendment, a revised plot plan for Lots 1A and 1B was recorded.[60] The 2014 Amendment did not alter the Original Declaration's covenants concerning ocean-side setbacks.[61]

### C. The Capanos Purchase and Plan to Develop Draper Subdivision Lot 2 and Lot 1B.

Plaintiff Louis J. Capano, III ("Plaintiff") is the current owner of Lot 2. He acquired that lot from his father, Louis J. Capano, Jr., in April 2018.[62] Plaintiff's

---

[57] JX 33; *see also* PTO ¶ 27.

[58] JX 33 ¶¶ 1–2.

[59] *Id.* ¶ 6.

[60] PTO ¶ 19; JX 33 at 4.

[61] *See generally* JX 33; *see also* JX 37.

[62] PTO ¶ 35.

14

father had purchased Lot 2 in 2002 from Pulieri for approximately $3.4 million.[63] Plaintiff's father specifically purchased the property for Plaintiff, always intending for Plaintiff to build a home on Lot 2.[64] The Capanos were attracted to the lot due to its large size and the lack of building restrictions, which resulted in an increased buildable area.[65]

When Plaintiff's father acquired Lot 2, he was aware of the Original Declaration and the restrictive covenants it contained.[66] No one told him of any other restrictive covenants applicable to Lot 2.[67] Prior to the Capanos' purchase, the Committee did not share with the Capanos the draft covenants from the failed efforts to amend the Original Declaration. In fact, Gaspard wrote to two neighbors in 2015: "I doubt that Capano has any awareness of the informal agreement on oceanside setbacks[.]"[68]

Plaintiff began planning to build a home on Lot 2 in 2005.[69] He retained an architect, Paul Kiss, for this purpose.[70] In 2007, in connection with Plaintiff's plans

---

[63] *See id.* ¶ 32; Trial Tr. at 5:5–23 (Capano, Jr.).

[64] Trial Tr. at 5:24–6:5, 6:13–19 (Capano, Jr.).

[65] *Id.* at 47:18–48:10 (Capano, III); *see also id.* at 6:6–12 (Capano, Jr.).

[66] *See id.* at 7:7–11 (Capano, Jr.).

[67] *Id.* at 7:12–20 (Capano, Jr.).

[68] JX 40 at 1.

[69] Trial Tr. at 48:11–13 (Capano, III).

[70] *See id.* at 49:8–50:1 (Capano, III); *see also* Dep. Tr. of Capano, III at 8:17–9:11.

for Lot 2, Kiss sent a request to Griffin for Draper Subdivision's "community guidelines for materials and requirements."[71]  In response, Griffin asked Gaspard to send Kiss the requested materials.[72]  There is no evidence Kiss received anything except the Original Declaration.  Ultimately, Plaintiff determined not to build a house at that time.[73]

### 1.    Plaintiff's father builds a house on Lot 1B.

In 2014, Plaintiff's father purchased Lot 1B, and Kiss began designing construction plans.[74]  Kiss's colleague requested a copy of any covenants or regulations applicable to the Draper Subdivision, as Kiss had done in 2007.[75]  In response, Gaspard sent only a copy of the Original Declaration.[76]  The message attaching the Original Declaration made no mention of any other covenants applicable to Lot 2.[77]

Plaintiff's father, through his architectural design team, submitted building plans for Lot 1B to the Committee in July 2015.[78]  At that time, the Committee

---

[71] JX 28 at 1.

[72] *Id.*

[73] *See* Trial Tr. at 50:6–10 (Capano, III).

[74] *See id.* at 24:5–10 (Capano, Jr.).

[75] JX 34 at 1.

[76] *Id.* at 1–20; *see also* Trial Tr. at 99:13–100:2 (Gaspard).

[77] JX 34 at 1; *see also* JX 52 at 1; Trial Tr. at 99:13–100:2 (Gaspard); Dep. Tr. of Gaspard at 106:3–107:8.

[78] *See* JX 39 at 1–2.

comprised Lot 7's Gaspard, Lot 3's Griffin, and Lot 8's owner—Defendant John

Burke.[79] Gaspard found no fault with the plans and drafted an approval letter.[80] But

Griffin expressed concerns.[81] Griffin worried that the house on Lot 1B would

influence construction of a house on Lot 2, which could affect the ocean-side

sightlines from his home on Lot 3.[82]

In the final July 21, 2015 approval letter sent to Plaintiff's father, the

Committee included Griffin's concerns. The Committee wrote:

> We would also like to raise an issue which affects us all –
> sightlines. When the Subdivision first began to be
> developed in 1997, lot owners *informally agreed* to a set
> of main structure (vs low porches or decks) setbacks from
> the DNREC building restriction line so as to ensure that
> we each have an unobstructed view up and down the
> shoreline. This was particularly important for us because
> of preexisting adjacent houses – the "gray house" . . .
> immediately to our south was 18' from the DNREC line
> and the old Draper house on Lot 1 was 40'. What resulted
> was agreement to main structure setbacks from the
> DNREC line for all of the houses built since. Because the
> DNREC line angles a bit to the west, it appears that your
> plan's ~14' main structure setback supports good
> sightlines for lots to the south, but we wonder how this will
> be affected by eventual construction on Lot 2. . . . [We]
> ask that you consider this issue.[83]

---

[79] *See* JX 42 at 2.

[80] JX 41 at 1–2.

[81] *See* JX 40 at 1–2.

[82] *See id.* at 2; JX 44.

[83] JX 42 at 2 (emphasis added).

17

The Committee subsequently sent Plaintiff's father the plot drawings reflecting the Draper Line.[84]

On July 23, 2015, Kiss's colleague responded to the approval letter by email, calling the informal agreement referenced therein a "Gentlemen's Agreement" in both the text and subject line of the email.[85] Gaspard, Griffin, and Burke received the communication, but in responding, they did not object to the characterization of the Draper Line as a "Gentlemen's Agreement."[86]

Kiss responded on August 11, 2015, noting that the "gentlemen's agreement" was "not anywhere in the covenants, and there was no mention of it when [Kiss's] design team contacted [the Committee] beginning back in March 2015, or on subsequent communications between [Kiss's] office and [Plaintiff's father] and the association."[87] Kiss also provided the Committee with a study that analyzed the building length of each lot relative to both the Declaration's DNREC line and the Draper Line.[88] The analysis demonstrated that the Draper Line disproportionately affected the buildable area of Lots 1A, 1B and 2.[89] In response, Griffin sent an email

---

[84] *See* JX 43 at 1–3.

[85] JX 46 at 2.

[86] *Id.* at 1.

[87] JX 52 at 1.

[88] *See id.* at 1–2.

[89] *See id.*

18

acknowledging that the ocean-side setbacks contemplated by the Draper Line would need to be revised for Lots 1A, 1B, and 2 and suggesting setbacks of 20 feet for Lots 1A and 1B and 25 feet for Lot 2.[90] Plaintiff's father did not alter his building plans for Lot 1B.[91]

### 2. The Committee rejects Plaintiff's plans to build a house on Lot 2.

In 2017, Plaintiff resumed his plans to build a home on Lot 2. His family had grown since 2005, so Plaintiff planned to build a larger home requiring new building plans.[92] On December 20, 2017, through Kiss, Plaintiff submitted his new building plans to the Committee.[93] The plans conformed to the requirements of the Declaration but not the Draper Line.[94] Griffin received the plans because he was a member of the Committee, albeit a recused member. Griffin purportedly recused himself from consideration of Plaintiff's plan because Griffin's Lot neighbored Capano's Lot.[95] Although Griffin had recused himself, he recommended that the Committee reject Plaintiff's plans,[96] which the Committee did by letter dated

---

[90] JX 56.

[91] Trial Tr. at 19:2–14 (Capano, Jr.).

[92] *See id.* at 51:12–54:8 (Capano, III).

[93] JX 66 at 1–8.

[94] *See* Trial Tr. at 102:4–22 (Gaspard).

[95] *See id.* at 223:24–10 (Gaspard); Dep. Tr. of Griffin at 44:3–15.

[96] JX 71; *see also* JX 67.

December 30, 2017, citing "sight line blockage" concerns, "particularly on the ocean side."[97]

Kiss responded to the Committee's rejection letter in early January 2018. Kiss's response attached sightline renderings "illustrat[ing] the minimal impact" of Plaintiff's proposed home on neighboring lots' ocean and lake views.[98]

In response, the Committee encouraged "owner-to-owner conversations" between Plaintiff and Griffin.[99] Through these conversations, Plaintiff proposed adjustments, which did not resolve Griffin's concerns.[100]

Plaintiff resubmitted his building plans through Kiss on March 9, 2018.[101] The Committee again rejected the plans, citing "material sight line occlusion."[102] In rejecting the plans, the Committee requested that Plaintiff line up his house to his father's house on Lot 1B and remove the "roof, storm shutters, and knee walls" from the planned patio area on the ocean side of the house.[103] Through counsel, Plaintiff followed up with a letter on March 19, 2018, seeking prompt approval. The

---

[97] JX 72.

[98] JX 74 at 1–2.

[99] JX 79; *see also* JX 75 at 1; Trial Tr. at 57:12–58:16 (Capano, III).

[100] *See generally* Trial Tr. at 58:17–65:19 (Capano, III); *see also* JX 86 at 1.

[101] PTO ¶ 43; *see also* JX 91.

[102] JX 95.

[103] *Id.*

20

Committee responded on June 1, 2018, standing firm in its rejection of Plaintiff's plans.[104]

## D. Procedural History

On June 6, 2018, Plaintiff commenced this litigation against the Association, the Committee, and the Committee's then-current members—Burke, Gaspard, and Bruce Harwood (collectively, "Defendants"). As mandated by 10 *Del. C.* § 348, the parties engaged in mediation.[105] This matter was set for trial when mediation efforts failed.[106] Plaintiff commenced construction on Lot 2 while this litigation was pending. On December 20, 2018, on Defendants' motion for injunctive relief, this Court issued an order enjoining Plaintiff from building on Lot 2 without Committee or Court approval of his building plans.[107] The Court lifted the order at the conclusion of trial.[108]

## II. ANALYSIS

Plaintiff seeks three forms of relief: (1) a declaration that the plans comply with the Declaration and that the Committee has no legal basis for denying Plaintiff's building plans, (2) an injunction preventing Defendants from interfering with

---

[104] PTO ¶ 46; JX 126 at 1.

[105] Dkt. 8; Dkt. 9; Dkt. 11.

[106] *See* Dkt. 11.

[107] Dkt. 86, Telephonic Oral Arg. on Pl.'s Mot. to Compel and Defs.' Mot. for a TRO and Rulings of the Ct. at 27:17–31:15.

[108] *See* Trial Tr. at 303:8–17 (Court); *see also id.* at 438:5–7 (Court).

Plaintiff's use and enjoyment of Lot 2, and (3) an award of attorneys' fees and costs pursuant to 10 *Del. C.* § 348(e).[109]

Defendants argue that Plaintiff's plans should be denied because they violate an equitable restriction on the buildable area of Lot 2.[110] According to Defendants, in the late 1990s, all but one of the Draper Subdivision's lot owners entered into an agreement to abide by the Draper Line, thereby creating an equitable servitude binding on Plaintiff's Lot 2.[111] Defendants contend that the equitable servitude imposes a 30 foot setback beyond the DNREC line applicable to Lot 2.[112]

## A. Declaratory Judgment

Declaratory judgment is "designed to afford relief from uncertainty regarding rights" and is routine in actions involving property rights.[113] Plaintiff seeks a specific

---

[109] Dkt. 1, Verified Compl. for Declaratory J. and Injunctive Relief ("Compl.") ¶¶ 24–39, PRAYER FOR RELIEF ¶¶ A–D.

[110] *See* Defs.' Ans. Br. at 3–4.

[111] *See id.* at 3. Defendants also argue that Plaintiff lacks standing to pursue this action. *Id.* at 41. Defendants argue that Plaintiff could not seek approval of his building plans for Lot 2 until he acquired title in April 2018, thereby rendering his December 2017 and March 2018 plan submissions improper. *See id.* at 41–42. They further argue that because Plaintiff was not a lot owner at the time of his plan submissions, he cannot pursue remedies in connection with the rejection of those submissions. *See id.* at 41 ("Before then, he had no standing to pursue remedies for violating covenants . . . ." (emphasis omitted)). This argument is not persuasive. The Committee issued its final rejection of Plaintiff's plans well after Plaintiff took title to Lot 2. Further, the Declaration's building covenants are applicable to Plaintiff as an occupier of the lot. *See* JX 1 ¶ 15.

[112] *See, e.g.*, Defs.' Ans. Br. at 3, 21–22.

[113] *Green v. Templin*, 2010 WL 2734147, at *8 (Del. Ch. July 2, 2010); *see also Heathergreen Commons Condo. Ass'n v. Paul*, 503 A.2d 636, 645 (Del. Ch. 1985)

two-part declaration that Plaintiff's home is fully compliant with the Declaration and that Defendants have no basis for denying Plaintiff's building plans.

### 1. Plaintiff's building plans comply with the Declaration.

The first requested declaration is easily delivered. When determining whether Plaintiff's building plans comply with the Declaration, the Court considers the plain meaning of the Declaration's provisions.[114] Paragraph 10.2 of the Declaration establishes the DNREC line as the building setback line for the ocean side of Plaintiff's Lot 2.[115] Plaintiff's plans propose no structure beyond the DNREC line.[116] Plaintiff's plans are therefore compliant with the plain language of the Declaration. Defendants appear to concede this point.[117]

### 2. Defendants have not proven the existence of an equitable servitude.

The second requested declaration presents a less straightforward analysis. Defendants argue that Plaintiff's building plans violate an equitable servitude—a

---

(describing "declaratory judgment actions involving the validity, applicability, or interpretation of land use restrictions" as "normally cognizable in this Court").

[114] *See, e.g.*, *In re Blue Rock Manor Civic Ass'n v. Hartline*, 1992 WL 251381, at *2 (Del. Ch. Sept. 29, 1992) ("It is well established law that restrictive covenants affecting real property are strictly construed and should not be enlarged by implication by the courts. Such covenants are construed in accordance with their plain meaning in favor of a grantee and against the grantor or one who enforces in his place." (citation omitted)).

[115] JX 1 ¶ 10.2.

[116] JX 66 at 2.

[117] *See* Trial Tr. at 102:4–22 (Gaspard); *id.* at 279:23–280:14 (Burke).

23

covenant that runs with the land in equity.[118]  Equitable servitudes are a recognized

means of balancing the rights of property owners and neighboring property owners'

expectations for their community.[119]  Yet "[t]he settled policy of the law favors the

free use of land."[120]  Therefore, "restrictive covenants affecting real property are

strictly construed."[121]  Further, the proponent of an equitable servitude must prove

its existence by clear and convincing evidence.[122]

Under Delaware law, an equitable servitude may be established in one of two

ways:  (1) "by implication as is usually ascertained from a common plan of

development" or (2) "by explicit written language of the intent of the grantor and the

---

[118] *See One Va. Ave. Condo. Ass'n of Owners v. Reed*, 2005 WL 1924195, at *12 (Del. Ch. Aug. 8, 2005) (noting that an equitable servitude is a covenant that "runs with the land in equity"); *Henlopen Acres, Inc. v. Potter*, 127 A.2d 476, 480 (Del. Ch. 1956) (noting that a covenant running with the land is called an equitable servitude by some courts).

[119] *New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 757 (Del. Ch. 2013), *aff'd*, 105 A.3d 990 (Del. 2014).

[120] *Leon N. Weiner & Assocs., Inc. v. Krapf*, 623 A.2d 1085, 1092 (Del. 1993); *see also Bradley v. Old Landing Ass'n*, 2007 WL 3317600, at *6 (Del. Ch. Nov. 7, 2007) (Master's Final Report) (stating that "[w]here there are restrictive covenants binding the land, the law traditionally favors property rights over contractual rights").

[121] *Reeder v. Teeple*, 1993 WL 211825, at *2 (Del. Ch. June 8, 1993).

[122] *Pike Creek*, 82 A.3d at 757–58 ("The County, as the proponent of a restrictive covenant . . . 'has the burden of establishing the equitable restrictions that they seek to have imposed.'  Thus, in order to enforce the . . . restriction it suggests, the County must demonstrate by clear and convincing evidence, that it has a 'right to benefit from an implicit imposition' . . . .").  *Pike Creek* applied a clear and convincing standard in considering an alleged implicit servitude.  The parties agree that this standard also applies to explicit servitudes.  *See* Pl.'s Opening Br. at 36; Defs.' Ans. Br. at 20.

24

grantee to create a restrictive covenant in the deed . . . or another recorded document."[123]

Defendants pursue the first theory, arguing that an equitable servitude was created by implication.[124] Implied servitudes are disfavored by this Court because they necessarily involve a "relaxation of the writing requirement."[125] The doctrine of implied covenants applies in limited circumstances "to enforce the express scope of a written restriction which has been unintentionally omitted from one of several similarly-situated deeds."[126] Where "an owner lays out a tract of land into building lots, records it as a subdivision plat, and sells to various purchasers, inserting the same or similar covenants in all of the deeds, an intent to benefit all the land in the tract and to induce purchases thereby may be inferred."[127] To prevail on an implied covenant theory, at a minimum, its proponent must demonstrate by clear and

---

[123] *Pike Creek*, 82 A.3d at 757 (internal quotation marks omitted).

[124] Defs.' Ans. Br. at 18–20.

[125] *Bradley*, 2007 WL 3317600, at *6 (explaining that "[r]ecognition of an implied restrictive covenant necessarily involves a relaxation of the writing requirement, and thus, implied covenants are not favored by courts and are [instead] construed in favor of the unrestricted use of free property" (internal quotation marks omitted)); *see also Pike Creek*, 82 A.3d at 757 (stating that "[i]mplied servitudes are disfavored by the Court").

[126] *Pike Creek*, 82 A.3d at 758.

[127] *Leon N. Weiner & Assocs., Inc.*, 623 A.2d at 1089.

25

convincing evidence that a common plan in fact existed "at the time the subdivision was first recorded and, thereafter, as lots were sold."[128]

Defendants have provided no evidence that as of 1995 (when the Draper Subdivision was first recorded) there was a general plan of development that included additional setbacks from the DNREC line, much less the specific 30 foot ocean-side setback for Lot 2 that Defendants seek to enforce.[129] The Declaration itself reflects that at the time the Draper Subdivision was first recorded, the DNREC line constituted the ocean-side (the "rear-yard") setback line.[130] Crediting Defendants' evidence, the Draper Line was not envisaged until 1997,[131] well after

---

[128] *The Greylag 4 Maint. Corp. v. Lynch-James*, 2004 WL 2694905, at *6 (Del. Ch. Nov. 18, 2004); *see also Pike Creek*, 82 A.3d at 758.

[129] Although the length of the proposed setback is not consequential to this analysis, it bears noting that Defendants' proposed equitable servitude has evolved over the course of this litigation. In their Answer, Defendants stated that the alleged servitude imposed on Lot 2 a 35' setback from the DNREC line. Dkt. 6, Defs.' Answer to Verified Compl. ¶ 46. In written discovery responses, Defendants stated that the servitude they promote requires only a 30' setback from the DNREC line. JX 132 at 11. The Association's corporate representative testified during his deposition that the servitude requires a 14' setback from the DNREC line. Dep. Tr. of Gaspard at 28:21–30:10. This last version of Defendants' theory is consistent with the restriction for which the Committee sought Plaintiff's consent when refusing to approve his plans. *See* JX 95 (directing Plaintiff to move his planned house such that it lines up with his father's house on Lot 1B); JX 42 at 2 (acknowledging that Plaintiff's father's buildings plans for Lot 1B reflected a 14 foot setback from the DNREC line); *see also* JX 127 at 2. In post-trial briefing, however, Defendants described the 14' setback as a proposed accommodation and advocated for the 30' setback. Defs.' Ans. Br. at 22–24.

[130] *See* JX 1 ¶ 10.2; JX 2.

[131] *See supra* n.25.

26

the Draper Subdivision was first recorded. Thus, Defendants have not proven a necessary requirement to support the remedy they seek.

Defendants do not seem to advocate for an explicit servitude, but the record is muddled,[132] and thus this decision addresses the theory for completeness. To establish an explicit servitude, its proponent must demonstrate that "(1) the claimed restrictive covenant 'touches and concerns' the land, (2) the original covenanting parties 'intended' to create a binding covenant, and (3) the successor to the burden had 'notice' of the covenant when he acquired his interest in the subject property."[133] Defendants have not proven the second or third elements of this test.

To demonstrate intent, Defendants seem to assert that a covenant was formed by the agreement of Pulieri, as the owner of Lot 2, along with the owners of Lots 3, 4, 5, and 7, and possibly Lot 8.[134] The only evidence from Pulieri to which Defendants point is Pulieri's 1998 memorandum.[135] On its face, the memorandum

---

[132] *See* Defs.' Ans. Br. at 19 & n.8 (setting forth the elements of an explicit servitude); *id.* at 20 ("Draper has proven by clear and convincing evidence the existence of an implied, or equitable covenant (i.e., the [Draper equitable covenant]) which applies to Lot 2."); *see also id.* at 25 (arguing that "the records of the Subdivision Association establish that as of 1999, enough owners necessary to amend the Declaration to add the Draper Line supported that amendment" (internal footnote omitted)); *id.* at 27 ("The fourth paragraph of the [Pulieri memorandum] states clearly that Pulieri agreed to a 30-foot setback for Lot 2.").

[133] *Van Amberg v. Bd. of Governors of Sea Strand Ass'n*, 1988 WL 36127, at *6 (Del. Ch. Apr. 13, 1988).

[134] *See* Defs.' Ans. Br. at 25–26; *see also* JX 136.

[135] *See* Defs.' Ans. Br. at 26 (discussing JX 8).

27

does not reflect an intent to create a binding restrictive covenant that would supersede the Declaration in the absence of a formal amendment. Rather, the memorandum is best described as a counteroffer to the Committee's proposal.[136] Defendants have not pointed to any credible contemporaneous evidence reflecting that the Association members agreed to Pulieri's counteroffer. None except one acknowledged it in writing.[137] As minutes of multiple Association annual meetings reflect, for years after receiving the Pulieri memorandum, the Association continued to view as unresolved the issue of ocean-side setbacks.[138] In selling Lot 2 to Plaintiff's father, Pulieri did not disclose the existence of any additional covenants, providing circumstantial support for the proposition that Pulieri did not intend to form an equitable servitude or believe that he had done so in 1998.[139]

Given the lack of any contemporaneous evidence reflecting intent, and the extensive evidence suggesting a lack of intent, Defendants have not met their burden in demonstrating the second element of an explicit servitude.

---

[136] *See* JX 8 (stating: "I have considered the Committee's proposal concerning oceanfront setbacks" and "I intend to maintain the exclusion for Lot 1. With regard to Lot 2, I am willing to agree to a 30' setback from the DNREC line for any house structure.").

[137] JX 10 (bearing handwritten note: "P.S. Lot 1 @ No Agmt & Lot 2 @ 30FT is acceptable. If best we can do.").

[138] *See* JX 13 at 1; JX 18 at 2; JX 20 at 2; JX 21 at 1.

[139] Trial Tr. at 7:12–15 (Capano, Jr.).

As critical, Defendants have failed to meet their burden of proving the third element of an explicit servitude—that the Capanos were on notice of the restriction. To be enforceable, "successor owners must have had 'notice' of the claimed restriction at the time they acquired their interest in the property."[140] "This is because fundamental fairness requires that a property owner be given notice, whether written or *de facto*, of the specific requirements to which the building plans must conform . . . ."[141] Indeed, "[i]n equity, a purchaser is bound only by those restrictive covenants binding his property of which he has actual or constructive notice."[142]

Defendants appear to concede that Plaintiff's father had no actual notice of the putative ocean-side setback prior to purchasing Lot 2.[143] Plaintiff's father had never seen Gaspard's renderings, Pulieri's 1998 memorandum, or any of the Association minutes discussing a proposed restriction, and no one had informed him of the Draper Line.[144] Gaspard himself acknowledged as much, writing in 2015: "I

---

[140] *Van Amberg*, 1988 WL 36127, at *7.

[141] *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 270 (Del. Ch. Aug. 22, 1986), *aff'd*, 538 A.2d 1113 (Del. 1988).

[142] *Van Amberg*, 1988 WL 36127, at *7.

[143] *See generally* Defs.' Ans. Br. (making no argument that Plaintiff's father had notice of the putative ocean-side setback prior to purchasing Lot 2).

[144] *See* Trial Tr. at 7:7–20, 13:24–14:9 (Capano, Jr.); *id.* at 141:2–12 (Gaspard); Dep. Tr. of Capano, Jr. at 15:2–16:22; *see also* Dep. Tr. of Gaspard at 127:21–128:6, 183:19–184:1, 196:8–17.

doubt that Capano has any awareness of the informal agreement on oceanside setbacks."[145]

Defendants argue that Plaintiff's knowledge of the ocean-side setback, supposedly acquired before Plaintiff obtained title to Lot 2, satisfied the notice requirement.[146] Defendants contend that notice is not an element necessary to create a servitude, but rather, speaks to the fairness of enforcing a servitude. To Defendants, the notice required to create an equitable servitude may effectively leapfrog transferors to burden potential acquirers with servitudes of which the transferors were unaware.[147]

Defendants' leapfrog argument fails for a number of reasons. Most obvious, Defendants have not proven that Plaintiff had actual notice of an enforceable ocean-side setback. When Plaintiff's architects reached out to the Committee in both 2007

---

[145] JX 40 at 1.

[146] *See* Defs.' Ans. Br. at 2, 29–36.

[147] *See id.* at 29–31. In asserting that fairness of *enforcement* should be the cornerstone of this Court's analysis of whether the notice requirement has been met, Defendants rely on *Seabreak Homeowners Association, Inc. v. Gresser*, 517 A.2d 263 (Del. Ch. Aug. 22, 1986). *Id.* at 29. In *Seabreak*, the Court noted that where a property owner must submit plans to a committee for approval, "fundamental fairness requires that a property owner be given notice, whether written or *de facto,* of the specific requirements to which the building plans must conform" to receive committee approval. 517 A.2d at 270. But *Seabreak* did not address whether notice is essential to the creation of a servitude. Rather, after finding that an architectural review committee lacked the power to adopt a servitude under the governing declaration of restrictions, the Court made an alternative holding that application of a servitude allegedly created after property owners purchased their lot and designed their house was "arbitrary and unreasonable." *Id.* at 271.

and 2015 to determine what covenants governed the Draper Subdivision, they were only provided with the Original Declaration. Plaintiff later learned of the so-called "gentlemen's agreement," but Plaintiff credibly testified that he believed that any setback agreement was strictly informal and therefore unenforceable.[148] Plaintiff's view is consistent with the documents on which Defendants rely, which continuously refer to the setback as an "informal agreement" or a "gentlemen's agreement."[149] The Committee, in one of its draft letters to Plaintiff, acknowledged the lack of any binding covenant, stating: "Projecting forward, we would like to see an agreement that could fix oceanside setbacks for all Draper lots, regardless of possible future building changes."[150] Thus, the record supports a conclusion that Plaintiff had knowledge of the community members' desire to impose a 30' ocean-side setback on Lot 2. The record does not support a conclusion that Plaintiff had notice that Lot 2 was burdened with an enforceable equitable servitude.

---

[148] *See* Trial Tr. at 57:21–58:16, 77:8–16, 83:11–84:16 (Capano, III); *see also id.* at 66:20–67:8 (Capano, III).

[149] *See* JX 40 at 1 (referring to the "informal agreement"); JX 49 at 1 (bearing the subject line: "Draper Subdivision 'Gentleman's Agreement' setback"); *see also* JX 36 (stating that "[w]e all voluntarily agreed to and honored an ocean front building restriction line behind the permitted line"); JX 42 at 2 (stating that "lot owners informally agreed to a set of main structure . . . setbacks from the DNREC building restriction line").

[150] JX 93 at 3. Defendants raise a "D.R.E. 701" objection to JX 93. Dkt. 101, Ex. A to Joint Schedule of Evid. at 7. Delaware Rule of Evidence 701 places limits on opinion testimony by lay witnesses. Neither Plaintiff nor the Court relies on JX 93 for opinion testimony. Defendants' objection is therefore overruled.

Moreover, if adopted as law, Defendants' leapfrog argument would permit community members to create enforceable covenants (by email or otherwise) against select, individual potential purchasers, to the detriment of property owners. Such a rule runs contrary to Delaware policy favoring the free use of land and Delaware law disfavoring equitable servitudes.

Defendants' leapfrog argument would further result in inequities unique to the facts of this case. Gaspard testified that the Association endeavors to allow smooth transfers of homes from parents to children.[151] Defendants' litigation position, which penalizes the Capanos' generational transfer, is inconsistent with this mission. Indeed, had Plaintiff's father known that transferring title of Lot 2 to his son would, in effect, create a legally binding covenant affecting use of nearly 20 percent of his land, he would not have transferred the title.[152]

## B.     Injunctive Relief

In order to prevail on his request for a permanent injunction against Defendants, Plaintiff must demonstrate: "(1) actual success on the merits of [his] claims; (2) that [he] will suffer irreparable harm if injunctive relief is not granted;

---

[151] Trial Tr. at 88:12–90:20 (Gaspard).

[152] *See id.* at 9:19–10:15 (Capano, Jr.); JX 52 at 2; *see also* Trial Tr. at 49:3–7 (Capano, III).

and (3) that the harm that would result if an injunction is not granted outweighs the harm to [Defendants] if an injunction is granted."[153]

As set forth above, Plaintiff is entitled to a declaratory judgment that Plaintiff's planned home is fully compliant with the Declaration and that Defendants have no basis to deny Plaintiff's plans. While Plaintiff has demonstrated success on the merits of his primary claim, he has not demonstrated the second or third elements of his claim for injunctive relief. Specifically, Plaintiff has not demonstrated that beyond a declaration, injunctive relief is also needed to ensure Plaintiff can use and enjoy his property, including by constructing his planned home. "A mandatory injunction represents extraordinary relief that should be granted only sparingly."[154] This action does not present that rare circumstance.

## C. Attorneys' Fees

Plaintiff and Defendants both seek attorneys' fees and costs incurred in this action pursuant to Section 348(e) of Title 10 of the Delaware Code.[155] Under Section 348(e), "[t]he nonprevailing party at a trial held pursuant to the provisions of this section must pay the prevailing party's attorney fees and court costs, unless the court

---

[153] *Jackson's Ridge Homeowners Ass'n v. May*, 2007 WL 4179310, at *3 (Del. Ch. Nov. 20, 2007).

[154] *Kuhns v. Bruce A. Hiler Del. QPRT*, 2014 WL 1292860, at *22 (Del. Ch. Mar. 31, 2014), *aff'd sub nom. Hiler v. Kuhns*, 116 A.3d 1243 (Del. 2015).

[155] *See* Pl.'s Opening Br. at 43–46; Defs.' Ans. Br. at 48.

finds that enforcing this subsection would result in an unfair, unreasonable, or harsh outcome."[156] The "purpose of § 348(e) is to subject parties to disputes to the risk that they will pay both sides' costs if they turn out to be the loser."[157] "[S]ection 348 was likely 'designed to encourage residents to voluntarily comply with restrictive covenants and homeowners associations to be reasonable in enforcing such covenants.'"[158] "[T]his court cannot second-guess the policy judgment of the General Assembly that fee shifting should be awarded [to the prevailing party] unless the court finds it unfair, unreasonable, or harsh."[159]

In this action, Plaintiff is the prevailing party—the Court is granting Plaintiff the primary relief he seeks, a declaratory judgment. Defendants are the nonprevailing parties—having put forth defenses that failed to defeat Plaintiff's claim. With one exception, it would not be unduly harsh to award Plaintiff his fees. Defendants argue that fee shifting is unwarranted in this action, because Defendants "negotiated with Plaintiff" and did not pursue meritless claims.[160] But such circumstances are not unique to this action. Permitting nonprevailing parties to

---

[156] 10 *Del. C.* § 348(e).

[157] *Swann Keys Civic Ass'n v. Shamp*, 2008 WL 4698478, at *1 (Del. Ch. Oct. 10, 2008), *aff'd*, 971 A.2d 163 (Del. 2009), *as corrected* (Mar. 26, 2009).

[158] *Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2018 WL 6534456, at *11 (Del. Ch. Dec. 10, 2018) (Master's Final Report).

[159] *Swann Keys Civic Ass'n*, 2008 WL 4698478, at *1.

[160] Defs.' Ans. Br. at 50.

avoid fee shifting in such circumstances would undermine the legislature's policy

determination regarding fee shifting.[161]

Now comes the exception. After having commenced this action to obtain a

declaration enabling Plaintiff to build on Lot 2, Plaintiff decided to begin building

before obtaining that declaration. This prompted a motion for injunctive relief by

Defendants, and the Court granted that relief. When Plaintiff credibly testified at

trial that he had no intent to build beyond the disputed setback line, the order was

lifted. But Defendants had no knowledge of Plaintiff's intent when Plaintiff

commenced construction. Plaintiff's fee award shall exclude fees and costs incurred

in connection with the order granting injunctive relief.[162]

---

[161] *See generally* 10 *Del. C.* § 348(e).

[162] *See generally Swann Keys Civic Ass'n*, 2008 WL 4698478, at *1 (observing that "[section] 348 does give this court discretion to deny fee shifting in whole, a discretion that includes the lesser power to conclude that whole hog fee shifting would be unfair, unreasonable, or harsh in the circumstances").

Plaintiff further seeks, pursuant to Court of Chancery Rule 41(d), attorneys' fees and costs incurred in defending against a lawsuit initiated by Griffin against Plaintiff in this Court on July 23, 2018. Pl.'s Opening Br. at 44–45. In that action, Griffin sought a declaration that the Committee properly denied Plaintiff's building plans. *See generally* Verified Compl., *Griffin v. Capano*, C.A. No. 2018-0536-JRS (Del. Ch. July 23, 2018). Griffin voluntarily dismissed that action pursuant to Court of Chancery Rule 41(a)(1). Under Rule 41(b), "[i]f a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the Court may make such order for the payment of costs of the action previously dismissed as it may deem proper." Ct. Ch. R. 41(d). According to Plaintiff, Griffin's participation in the litigation at hand, following the voluntary dismissal of his individual litigation, warrants fee shifting under Rule 41(b). *See* Pl.'s Opening Br. at 45. But Griffin did not commence the current litigation, and Rule 41(b) is technically inapplicable. Plaintiff's

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiff. Plaintiff is granted a declaration that Plaintiff's building plans comply with the Declaration and that the Committee has no legal basis for denying Plaintiff's plans. Plaintiff is also entitled to attorneys' fees and costs incurred in this action, with the exception of fees and costs incurred in connection with the order granting injunctive relief against Plaintiff.

request for attorneys' fees and costs incurred in connection with C.A. No. 2018-0536-JRS is denied.